**MOTION PICTURE ASSOCIATION OF AMERICA, INC., et al., Petitioners.**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**National Television Video Access Coalition, et al., Intervenors.**

**Nos. 01-1149, 01-1155.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 6, 2002.

Decided Nov. 8, 2002.

Robert Corn-Revere argued the cause for petitioner Motion Picture Association of America, Inc., et al. With him on the briefs was Ronald G. London.

Daniel F. Goldstein argued the cause and filed the briefs for petitioner National Federation of the Blind.

C. Grey Pash, Jr., Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, and Jacob M. Lewis, Attorney, United States Department of Justice. Catherine G. O'Sullivan, Chief Counsel, and Nancy C. Garrison, Attorney, United States Department of Justice, entered appearances.

Donald J. Evans argued the cause for intervenors. With him on the brief were Liliana E. Ward, Keith A. Noreika, and Robert A. Long, Jr.

Before: EDWARDS, HENDERSON, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.

HARRY T. EDWARDS, Circuit Judge:

The Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 ("the Telecommunications Act"), added new provisions covering video programming accessibility to the Communications Act of 1934, 47 U.S.C. § 151 et seq. ("the Act"). The new provisions, codified in § 713 of the Communications Act, 47 U.S.C. § 613, specifically dealt with "closed captioning" and "video description" technologies that can be employed to enhance television video services for hearing and visually impaired individuals. Closed captioning displays the audio portion of television signals as words displayed on the screen and can be activated at a viewer's discretion. Video descriptions provide aural descriptions of a television program's key visual elements (such as the movement of a person in a scene) that are inserted during pauses in the program dialogue. Video descriptions change program content because they require the creation of new script to convey program details, whereas closed captions present a verbatim transcription of the program's spoken words.

Congress treated the two technologies quite differently when it passed the Telecommunications Act, which added § 713 to the Communications Act. Section 713(a) required the Commission to complete a closed captioning inquiry and to report its findings to Congress within 180 days of the Act's passage. 47 U.S.C. § 613(a). Sections 713(b) and (c) required the Commission to prescribe closed captioning regulations and established compliance deadlines. 47 U.S.C. § 613(b)-(c). Sections 713(d) and (e) established exemptions from the closed captioning rules. 47 U.S.C. § 613(d)-(e). In contrast, subsections 713(f) and (g) – the sole subsections deal-ing with video description – merely defined "video description" and required the FCC to prepare a report to Congress. 47 U.S.C. § 613(f)-(g). Unlike the provisions covering closed captioning, § 713 did not authorize the Commission to adopt regulations implementing video descriptions.

After releasing a report on video description, the FCC announced that it was seeking commentary on proposed rules mandating video description. Implementation of Video Description of Video Programming, Notice of Proposed Rulemaking, 14 F.C.C.R. 19,845, 1999 WL 1044393 (1999) ("Notice of Proposed Rulemaking"). The FCC then adopted rules mandating television programming with video descriptions. Implementation of Video Description of Video Programming, Report and Order, 15 F.C.C.R. 15,230, 2000 WL 1091672 (2000) ("Report and Order"). The Motion Picture Association of America ("MPAA") and the National Federation of the Blind ("NFB") both petitioned this court for review of the agency's regulations mandating video descriptions. MPAA contends that the new regulations should be struck down because they are not authorized by § 1 and they are precluded by § 713 of the Act. See 47 U.S.C. §§ 151, 613. NFB contends that the regulations should be rejected as arbitrary and capricious, because the FCC failed to assess whether visually impaired persons actually want or need video description, as opposed to rules requiring spoken articulation of on-screen text.

By its terms, the Act does not provide the FCC with the authority to enact video description rules. Contrary to the FCC's arguments suggesting otherwise, § 1, 47 U.S.C. § 151, does not give the FCC unlimited authority to act as it sees fit with respect to all aspects of television transmissions, without regard to the scope of the proposed regulations. We hold that

where, as in this case, the FCC promulgates regulations that significantly implicate program content, § 1 is not a source of authority. Because the FCC can point to no other statutory authority, the video description regulations must be vacated. Accordingly, MPAA's petition for review is hereby granted. NFB's petition for review is dismissed as moot, because the regulations to which they object will be vacated pursuant to the court's judgment in this case.

## I. BACKGROUND

The Telecommunications Act added to the Communications Act new video programming accessibility provisions involving closed captioning and video description. 47 U.S.C. § 613. Video description is defined in the statute to include "the insertion of audio narrated descriptions of a television program's key visual elements into natural pauses between the program's dialogue." *Id.* § 613(g). Video descriptions are usually transmitted over a secondary audio programming channel, a subcarrier that allows video distributors to transmit additional soundtracks, such as foreign language programming. *Closed Captioning and Video Description of Video Programming, Report,* 11 F.C.C.R. 19,-214, 19,221, 1996 WL 420237 (1996) (*"Video Accessibility Report"*).

There is a marked difference between Congress' treatment of closed captioning and video description in § 713 of the Act. The new provision required the FCC to complete an inquiry into closed captioning, and report the results to Congress within 180 days of the Act's passage. 47 U.S.C. § 613(a). It also affirmatively required that the FCC prescribe regulations for the implementation of closed captioning, *id.* § 613(b), and established compliance deadlines for that action, *id.* § 613(c). In contrast, § 713 only required that the FCC prepare a video description report for Con-

gress; it did not mandate any implementation of visual descriptions. *Id.* § 613(f).

The initial House bill preceding the enactment of § 713 would have required the FCC to adopt video description rules. *See Report and Order,* 15 F.C.C.R. at 15,274 n. 9 (Powell, dissenting) (noting that H.R. 3636 § 206 provided that the FCC *"shall,* within 1 year of enactment of the [video programming accessibility] section, *prescribe* such regulations as are necessary to ensure that all video programming is fully accessible to individuals with disabilities through the provision of closed captioning service *and video description"* (emphases and bracketed language in original)). However, the bill was amended in committee to provide a discretionary grant of authority rather than mandate that the FCC provide video description. The new language provided that, "[f]ollowing the completion of such inquiry, the Commission may adopt regulation [sic] it deems necessary to promote the accessibility of video programming to persons with visual impairments." Amendment No. 8 to H.R. 3636 (Moorhead) (Mar. 16, 1994), *reprinted in* Joint Appendix ("J.A.") 237. This new version of the bill passed the House in 1995. H.R. 1555, § 204(f), 104th Cong. (1st Sess.1995), *reprinted in* J.A. 254-59.

The corresponding Senate bill, however, only directed the FCC to report to Congress about video description: It neither mandated video description nor provided the FCC with discretionary authority to adopt such rules. S. 652, § 305, 104th Cong. (1st Sess.1995), *reprinted in* J.A. 251-53. The conference committee adopted the Senate version, abandoning the House language providing the FCC with discretionary authority. Congress passed this version of the bill and the President signed it into law.

After the enactment of § 713, the FCC issued the report that the Act mandated.

The report stated that "the best course is ... to continue to collect information and monitor the deployment of video description and the development of standards for new video technologies that are likely to affect the availability of video description." *Video Accessibility Report,* 11 F.C.C.R. at 19,271. The FCC supplemented this report with a second report, *Annual Assessment of the Status of Competition in the Markets for the Delivery of Video Programming, Report,* 13 F.C.C.R. 1034, 1998 WL 10229 (1998). Then, in 1999, the FCC announced that it was seeking commentary on proposed rules that would mandate video description. *Notice of Proposed Rulemaking,* 14 F.C.C.R. 19,845. The Commission sought commentary, *inter alia,* about whether the FCC possessed statutory authority to enact such rules. *Id.* at 19,857-59 ¶¶ 34-39.

After reviewing the comments, the FCC voted 3-2 to adopt rules requiring certain video programmers to supplement certain programming with video descriptions. *See Report and Order,* 15 F.C.C.R. 15,230. The FCC concluded that it possessed the statutory authority to adopt these rules pursuant to § 1 of the Act. 47 U.S.C. § 151. Section 1 gives the FCC authority to regulate "interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States.... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service...." 47 U.S.C. § 151. The FCC majority also rejected the argument that § 713, 47 U.S.C. § 613, precluded the agency from mandating video description merely because the provision only authorized the FCC to conduct an inquiry. *Report and Order,* 15 F.C.C.R. at 15,252-54 ¶¶ 57-61. Finally, the FCC found that the record demonstrated "the importance of video description to persons with visual disabilities." *Id.* at 15,232 ¶ 4. The FCC primarily based this conclusion on the American Council for the Blind's submission, which contained more than 250 e-mails and letters of support for the rules. *Id.*

The FCC's video description rules require commercial television broadcasters affiliated with the top four commercial networks (ABC, CBS, Fox, and NBC) to provide fifty hours of video description per quarter during either prime time or children's programming. 47 C.F.R. § 79.3(b)(1). The rules also require multi-channel video programming distributors that serve 50,000 or more subscribers to provide fifty hours of video description per quarter during prime time or children's programming on each channel that carries one of the top five nonbroadcast networks. *Id.* § 79.3(b)(3).

Commissioners Powell and Furchtgott-Roth dissented from the visual description order, because they did not believe that the Communications Act authorized the FCC to adopt video description rules. *Id.* at 15,268-69 (Furchtgott-Roth, dissenting); 15,272-76 (Powell, dissenting).

Various parties sought reconsideration of the FCC's Order, primarily on the ground that the rules exceeded the FCC's legal authority. *Petition for Reconsideration of the MPAA,* MM Docket No. 99-339, Oct. 11, 2000, *reprinted in* J.A. 330-38; *Petition for Partial Reconsideration and Clarification Submitted by the National Association of Broadcasters,* MM Docket No. 99-339, Oct. 11, 2000, *reprinted in* J.A. 339-54; *Petition for Reconsideration of the National Cable Television Association,* MM Docket No. 99-339, Oct. 11, 2000, *reprinted in* J.A. 355-74. The FCC denied reconsideration, although it did refine certain implementation issues related to the new rules. *Implementation of Video Description of Video Programming, Memorandum Opinion and Order on Reconsideration,* 16 F.C.C.R. 1251, 2001 WL 43382

(2001), *erratum issued,* 66 Fed.Reg. 16,618 (Mar. 27, 2001). MPAA and NFB then filed petitions for review.

## II. ANALYSIS

### A. Standard of Review

■ In deciding whether to defer to the FCC's construction of the Act, we adhere to the tests enunciated by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). In *Chevron,* the Court held that, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43, 104 S.Ct. at 2781. This is so-called *"Chevron* Step One" review. If Congress "has not directly addressed the precise question" at issue, and the agency has acted pursuant to an express or implicit delegation of authority, the agency's interpretation of the statute is entitled to deference so long as it is "reasonable" and not otherwise "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44, 104 S.Ct. at 2782. This is so-called *"Chevron* Step Two" review. In either situation, the agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue. *See Ry. Labor Executives Ass'n v. Nat'l Mediation Bd.,* 29 F.3d 655, 671 (D.C.Cir.1994) (en banc) (*Chevron* "deference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied 'delegation of authority to the agency.'") (quoting *Chevron,* 467 U.S. at 843-44, 104 S.Ct. at 2781-83).

■ *Mead* reinforces *Chevron's* command that deference to an agency's interpretation of a statute is due only when the agency acts pursuant to "delegated author-

ity." 533 U.S. at 226-27, 121 S.Ct. at 2170-71. The Court in *Mead* also makes it clear that, even if an agency has acted within its delegated authority, no *Chevron* deference is due unless the agency's action has the "force of law." *Id.* at 227, 121 S.Ct. at 2171.

In this case, the principal question is whether Congress "delegated authority" to the FCC to promulgate visual description regulations. Absent such authority, we need not decide whether the regulations are otherwise "reasonable." An agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress.

### B. The FCC Lacks Statutory Authority to Adopt the Video Description Rules

MPAA argues that § 713 precludes the adoption of rules mandating video description and that § 1 does not otherwise authorize the FCC to adopt video description rules. We largely agree, although we rest principally on the latter point.

#### 1. Section 713

■ There is no doubt that § 713, 47 U.S.C. § 613, by its terms, does not provide the FCC with the authority to enact video description rules, and the FCC does not suggest that it does. The harder question is whether the provision effectively bars the FCC from mandating video description.

■ Statutory provisions *in pari materia* normally are construed together to discern their meaning. *Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972) (noting that the rule that statutes *in pari materia* should be construed together "is ... a logical extension of the principle that individual sections of a single statute should be construed together"); *Holyoke Water*

*Power Co. v. FERC,* 799 F.2d 755, 766 (D.C.Cir.1986) ("The three sections are *in pari materia* and must be read together."); *FAIC Sec., Inc. v. United States,* 768 F.2d 352, 363 (D.C.Cir.1985) ("[T]hese two statutes are *in pari materia* and must be construed together."). Here, when subsections (a), (b), and (f) of § 713 – all addressed to video programming accessibility – are construed together, a strong argument can be made that Congress meant not to authorize the Commission to mandate video description. The dissenting opinion of FCC Chairman Powell powerfully demonstrates this point. *See* 15 F.C.C.R. at 15,274-76 (Powell, dissenting).

Subsections (a) and (f) merely call for the FCC to undertake studies on closed captioning and video description, respectively. Subsection (f), which deals with video description, provides:

> Within 6 months after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], the Commission shall commence an inquiry to examine the use of video descriptions on video programming in order to ensure the accessibility of video programming to persons with visual impairments, and report to Congress on its findings. The Commission's report shall assess appropriate methods and schedules for phasing video descriptions into the marketplace, technical and quality standards for video descriptions, a definition of programming for which video descriptions would apply, and other technical and legal issues that the Commission deems appropriate.

47 U.S.C. § 613(f). In contrast, subsection (b) affirmatively mandates that

> the Commission shall prescribe such regulations as are necessary to implement this section. Such regulations shall ensure that – (1) video programming first published or exhibited after the effective date of such regulations is

fully accessible through the provision of closed captions . . .; and (2) video programming providers or owners maximize the accessibility of video programming first published or exhibited prior to the effective date of such regulations through the provision of closed captions. . . .

47 U.S.C. § 613(b). The difference in the language employed in these sections makes it clear that subsection (f) is not intended to provide a mandate for video description requirements. Subsection (f) neither parallels the closed captioning mandate contained in subsection (b) nor suggests that Congress provided the FCC with discretionary authority to adopt video description rules.

We need not decide whether § 713 positively forecloses agency rules mandating video description. Rather, we find that § 713 does not authorize the FCC to adopt such rules. We also find that, when coupled with the absence of authority under § 1 (discussed below), § 713 clearly supports the conclusion that the FCC is barred from mandating video description. We now turn to the question whether § 1, or any other provision in the Act, authorizes the Commission to mandate video description.

*2. Section 1 of the Communications Act of 1934*

■ The FCC's *Report and Order* argues that the FCC's authority to mandate video description is derived from the combination of § 1 of the Communications Act, 47 U.S.C. § 151, § 2(a) of the Act, 47 U.S.C. § 152(a) (stating that "[t]he provisions of this Act shall apply to all interstate and foreign communication by wire or radio . . . and to all persons engaged within the United States in such communication"), § 4(i) of the Act, 47 U.S.C. § 154(i) (stating that "[t]he Commission

may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions"), and § 303(r) of the Act, 47 U.S.C. § 303(r) (stating that "the Commission from time to time, as public convenience, interest, or necessity requires shall ... [m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act"). At oral argument, counsel for the FCC essentially conceded that if the agency cannot find its authority in § 1 then the video description regulations must be vacated by the court. We agree.

The FCC's majority opinion argues that § 1 authorizes the agency to mandate video description, because

> Congress ... authorized the Commission to make available to all Americans a radio and wire communication service, and to promote safety and life through such service, and to make such regulations to carry out that mandate, that are consistent with the public interest and not inconsistent with other provisions of the Act or other law.

15 F.C.C.R. at 15,252. This is a very frail argument, in no small part because it completely ignores the fact that video description regulations significantly implicate program content.

There is no doubt that the video description rules regulate programming content. Video description is not a regulation of television transmission that only incidentally and minimally affects program content; it is a direct and significant regulation of program content. The rules require programmers to create a second script. As Chairman Powell noted in his dissent, "video description is a creative work. It requires a producer to evaluate a program, write a script, select actors, decide what to describe, decide how to describe it and choose what style or what pace. In contrast, closed captioning is a straight translation of dialogue into text." *Report and Order,* 15 F.C.C.R. at 15,278 (Powell, dissenting). Ultimately, video descriptions require a writer to amend a script to fill in audio pauses that were not originally intended to be filled. Not only will producers and script writers be required to decide on what to describe, how to characterize it, and the style and pace of video descriptions, but script writers will have to describe subtleties in movements and mood that may not translate easily. And many movements in a scene admit of several interpretations, or their meaning is purposely left vague to enhance the program content. In short, it is clear that the implementation of video descriptions invariably would entail subjective and artistic judgments that concern and affect program content. The FCC has even acknowledged that the creation of this second script "raises creativity ... issues." *Video Accessibility Report,* 11 F.C.C.R. at 19,221. These effects are not insignificant, and there can be no doubt that the result is a direct regulation of program content.

The FCC's arguments to the contrary are entirely unpersuasive. *See Report and Order,* 15 F.C.C.R. at 15,254-56. First, the Commission is wrong in its claim that video descriptions are the same as closed captioning. One is a simple transcript, a precise repetition of the spoken words. The other requires an interpretation of visual scenes. They are not the same. Second, the FCC's statement that video descriptions are "not related to content" is specious. *Id.* at 15,255. FCC's counsel would not even endorse that position at oral argument. Requiring someone to change or add to a program script is related to the program's content. Finally, the FCC claims that the video description regulations are "content-neutral." *Id.* at 15,-

254-55. We need not decide that issue, because it is irrelevant. The question that we face is whether § 1 provides the FCC with authority to promulgate regulations that significantly regulate programming content. The content-neutrality of the rules is irrelevant to the inquiry of the FCC's delegated authority.

During oral argument, counsel for the FCC acknowledged that it was not self-evident from the statute that the FCC is authorized to regulate *program content* pursuant to § 1. Counsel's hesitation was well placed, because § 1 merely authorizes the agency to ensure that all people of the United States, without discrimination, have access to wire and radio communication transmissions. Section 1 does not otherwise authorize the FCC to regulate program content, as the video description regulations clearly do. Both the terms of § 1 and the case law amplifying it focus on the FCC's power to promote the accessibility and universality of transmission, not to regulate program content. Neither the FCC's Order nor its brief to this court cite any authority to suggest otherwise. To regulate in the area of programming, the FCC must find its authority in provisions other than § 1. *See, e.g.,* 47 U.S.C. § 531 (governing designation of cable channels for public, educational, or governmental use).

The Communications Act was implemented for the purpose of consolidating federal authority over communications in a single agency to assure "an adequate communication system for this country." S.Rep. No. 73-830, at 3 (1934); *see also* H.R.Rep. No. 73-1850, at 3-4 (1934). Given the limited distribution of communications facilities in 1934, § 1's mandate to serve "all the people of the United States" is a reference to the geographic availability of service. *See* Michael J. Aguilar, Note, *Micro Radio: A Small Step in the Return to Localism, Diversity, and Competitiveness in Broadcasting,* 65 Brook. L.Rev. 1133, 1136-37 (1999) (explaining how limited facilities influenced passage of the Communications Act of 1934); *see also Nat'l Broad. Co. v. United States,* 319 U.S. 190, 216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 (1943) ("The facilities of radio are limited and therefore precious; they cannot be left to wasteful use without detriment to the public interest."). Under § 1, Congress delegated authority to the FCC to expand radio and wire transmissions, so that they would be available to all U.S. citizens. *See, e.g., United States v. Midwest Video Corp.,* 406 U.S. 649, 667-68, 92 S.Ct. 1860, 1870, 32 L.Ed.2d 390 (1972) ("[T]he critical question ... is whether the Commission has reasonably determined that its origination rule will 'further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services....'") (citation omitted); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 172, 88 S.Ct. 1994, 2002-03, 20 L.Ed.2d 1001 (1968) ("[I]t was precisely because Congress wished to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission ... that it conferred upon the Commission a unified jurisdiction and broad authority.") (citations, footnotes, and internal quotations omitted). Section 1 does not address the *content* of the programs with respect to which accessibility is to be ensured. In other words, the FCC's authority under § 1 is broad, but not without limits.

The cases cited to this court by the FCC do not hold otherwise. These cases do not relate to program content. *See, e.g., United Video v. FCC,* 890 F.2d 1173 (D.C.Cir.1989) (FCC's "syndicated exclusivity" rules found to be content-neutral, not otherwise arbitrary and capricious,

and not violative of the Copyright Act of 1976 or the Cable Act of 1984; § 1 of the Communications Act not implicated); *Rural Tel. Coalition v. FCC*, 838 F.2d 1307, 1315 (D.C.Cir.1988) ("As the Universal Service Fund was proposed in order to further the objective of making communication service available to all Americans at reasonable charges, the proposal was within the Commission's statutory authority. We have recognized previously that universal service is an important FCC objective."); *North Am. Telecomm. Ass'n v. FCC*, 772 F.2d 1282 (7th Cir.1985) (action for review of FCC orders relating to conditions upon which major telecommunications corporation's regional operating companies could enter telephone equipment business); *GTE Serv. Corp. v. FCC*, 474 F.2d 724, 730 (2d Cir.1973) (regulations prescribing conditions under which common carriers may sell data processing services, designed to insure that "carriers provide efficient and economic service to the public").

One of the reasons why § 1 has not been construed to allow the FCC to regulate programming content is because such regulations invariably raise First Amendment issues. *E.g., Turner Broad. Sys. v. FCC*, 512 U.S. 622, 651, 114 S.Ct. 2445, 2464, 129 L.Ed.2d 497 (1994) ("[O]ur cases have recognized that Government regulation over the content of program broadcasting must be narrow, and that broadcast licensees must retain abundant discretion over programming choices."); *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 126, 93 S.Ct. 2080, 2098, 36 L.Ed.2d 772 (1973) (describing "the risk of an enlargement of Government control over the content of broadcast discussion of public issues" as a "problem of critical importance to broadcast regulation and the First Amendment"). Indeed, the parties in this case have argued over whether the video description rules infringe free speech precepts. *See* Br. of Petitioner at 39-43;

Br. of Respondent at 35-41. To avoid potential First Amendment issues, the very general provisions of § 1 have not been construed to go so far as to authorize the FCC to regulate program content. Rather, Congress has been scrupulously clear when it intends to delegate authority to the FCC to address areas significantly implicating program content. *E.g.*, 18 U.S.C. § 1464 ("Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both."); 47 U.S.C. § 315 (governing provision of broadcast time to candidates for public office); 47 U.S.C. § 399 ("No noncommercial educational broadcasting station may support or oppose any candidate for political office."). And Congress has imposed limitations on regulations implicating program content. *See* 47 U.S.C. § 544(f) (providing that "[a]ny Federal agency ... may not impose requirements regarding the provision or content of cable services, except as expressly provided in this title"); *see also* 47 U.S.C. § 326 (providing that the FCC does not possess the power of censorship, and "no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication"). It is therefore clear that § 1 is not the provision in the Act from which the FCC can find delegated authority to regulate the content of broadcast programming. The FCC must look beyond § 1 to find authority for regulations that significantly implicate program content.

The FCC's position seems to be that the adoption of rules mandating video description is permissible because Congress did not expressly foreclose the possibility. This is an entirely untenable position. *See Ry. Labor Executives'*, 29 F.3d at 671 ("Were courts to *presume* a delegation of power absent an express *withholding* of

such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.") (emphasis in original). *See also Halverson v. Slater,* 129 F.3d 180, 187 (D.C.Cir.1997) (quoting *Ry. Labor Executives,* 29 F.3d at 671); *Oil, Chem. & Atomic Workers Int'l Union v. NLRB,* 46 F.3d 82, 90 (D.C.Cir.1995) (same); *see also Ethyl Corp. v. EPA,* 51 F.3d 1053, 1060 (D.C.Cir.1995) ("We refuse ... to presume a delegation of power merely because Congress has not expressly withheld such power."); *Natural Res. Def. Council v. Reilly,* 983 F.2d 259, 266 (D.C.Cir.1993) (" '[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron.*' ") (quoting *Kansas City v. Dep't of Housing & Urban Dev.,* 923 F.2d 188, 191-92 (D.C.Cir.1991)) (alteration in original).

Congress enacted the closed captioning and video description provisions of § 713 together. After originally entertaining the possibility of providing the FCC with authority to adopt video description rules, Congress declined to do so. This silence surely cannot be read as ambiguity resulting in delegated authority to the FCC to promulgate the disputed regulations.

### 3. Other Statutory Provisions Cited by the Commission

■ The Commission's brief to this court advances the somewhat opaque argument that the video description rules are "obviously a 'valid communications policy goal' and in the public interest." Respondent's Br. at 26. The Commission thus claims that the regulations are justified under § 303(r), which permits the FCC to regulate in the public interest "as may be necessary to carry out the provisions of [the] Act." 47 U.S.C. § 303(r). But this statutory provision simply cannot carry the weight of the Commission's argument.

The FCC cannot act in the "public interest" if the agency does not otherwise have the authority to promulgate the regulations at issue. An action in the public interest is not necessarily taken to "carry out the provisions of the Act," nor is it necessarily authorized by the Act. The FCC must act pursuant to *delegated authority* before any "public interest" inquiry is made under § 303(r). This of course means, as FCC counsel conceded at oral argument, that the video description rules are arguably justified only if the FCC had authority to act pursuant to § 1 of the Act.

■ The FCC's suggestion that § 4(i), without more, gives the agency authority to promulgate the disputed rules cannot withstand scrutiny. Chairman Powell's discussion of this provision says it all:

It is important to emphasize that section 4(i) is not a stand-alone basis of authority and cannot be read in isolation. It is more akin to a "necessary and proper" clause. Section 4(i)'s authority must be "reasonably ancillary" to other express provisions. And, by its express terms, our exercise of that authority cannot be "inconsistent" with other provisions of the Act. The reason for these limitations is plain: Were an agency afforded *carte blanche* under such a broad provision, irrespective of subsequent congressional acts that did not squarely prohibit action, it would be able to expand greatly its regulatory reach.

15 F.C.C.R. at 15,276 (Powell, dissenting). We agree.

Finally, there is really nothing to be said about § 2(a), 47 U.S.C. § 152(a), which was also cited by the FCC in support of the video description regulations. This provision does not, on its own, support the regulations. Neither the FCC's Order nor counsel's argument on behalf of the FCC suggested otherwise.

In short, the FCC can point to no statutory provision that gives the agency authority to mandate visual description rules. The rules may be highly salutary. But that is not the issue before this court and we offer no judgment on the question. What is determinative here is the FCC acted without delegated authority from Congress. Section 1 does not furnish the authority sought, because the regulations significantly implicate program content and the FCC can cite no authority in which a court has upheld agency action under § 1 where program content was at the core of the regulations at issue. And it does not matter that the disputed rules here are arguably "content-neutral." The point is that the rules are about program content and therefore can find no authorization in § 1.

Finally, if there were any serious question about proper result in this case, all doubt is resolved by reference to § 713. In § 713(f), Congress authorized and ordered the Commission to *produce a report* – nothing more, nothing less. The statute does not, as with closed captioning, instruct (or even permit) the FCC to promulgate regulations mandating video description. Once the Commission completed the task of preparing the report on video description, its delegated authority on the subject ended.

### III. Conclusion

[G]iven the minimal extent to which the FCC and Congress actually influence the programming offered by broadcast stations, it would be difficult to conclude that Congress enacted [video description] in an effort to exercise content control.... In a regime where Congress or the FCC exercised more intrusive control over the content of broadcast programming, an argument similar to [the argument raised by the Commission] might carry greater weight. But in the present regulatory system, those concerns are without foundation.

*Turner Broad. Sys.*, 512 U.S. at 652, 114 S.Ct. at 2464. Accordingly, for the reasons given in this opinion, we hereby grant the petition for review filed by MPAA, and reverse and vacate the Commission's Order insofar as it requires broadcasters to implement video description.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

I believe that section 713 of the Communications Act, 47 U.S.C. § 613, plainly does not authorize the FCC to promulgate video description rules and, for that reason, I fully concur in that portion of the majority opinion that so holds. I do not agree, however, that the video description rules constitute "a direct and significant regulation of program content." Maj. Op. at 803. I fail to see how video description need consist of anything more than spoken stage directions. If so, video description, at least in my view, does not regulate program content. While I agree that section 1 of the Communications Act, 47 U.S.C. § 151, does not provide the FCC with authority to promulgate the video description rules, it is not because the rules regulate program content; in my view, neither section 1, nor any of the other provisions of the Act the FCC relies on, independently delegates authority that section 713 plainly withholds.