Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 19, 2003      Decided April 8, 2003

No. 01-1485

AT&T Corporation,
Petitioner

v.

Federal Communications Commission and
United States of America,
Respondents

———

On Petition for Review of Orders of the
Federal Communications Commission

———

*Daniel Meron* argued the cause for petitioner. With him on the briefs were *Joseph R. Guerra*, *Jonathan Cohn*, *Mark C. Rosenblum*, and *Peter H. Jacoby*.

*Richard K. Welch*, Associate General Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Jane E. Mago*, General Counsel, *John E. Ingle*, Deputy Associate General Counsel,

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Lisa E. Boehley*, Counsel, and *Catherine G. O'Sullivan*, Chief Counsel, U.S. Department of Justice, and *Steven J. Mintz*, Counsel.

Before: Tatel and Garland, *Circuit Judges*, and Williams, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* Tatel.

Tatel, *Circuit Judge*: The Federal Communications Commission assessed $80,000 in forfeiture penalties against AT&T for "slamming" two customers—that is, changing their long-distance telephone service without their authorization. Having paid the forfeiture, AT&T now petitions for review, arguing that in both instances it complied with the Commission's procedures for verification of telemarketing sales. Concluding that we have jurisdiction over AT&T's post-compliance challenge to the forfeiture, we hold that the Commission's requirement that telecommunications carriers guarantee that the actual line subscriber has authorized the service change order exceeds the Commission's statutory authority to prescribe procedures to verify that authorization. Accordingly, we vacate the relevant portions of the forfeiture orders.

I.

In order to prevent telecommunications carriers from making unauthorized changes to subscribers' telephone service—a practice known as "slamming"—the Telecommunications Act of 1996 makes it unlawful for telecommunications carriers to "submit or execute a change in a subscriber's selection of a provider of telephone exchange service or telephone toll service except in accordance with such verification procedures as the Commission shall prescribe." 47 U.S.C. § 258(a). In its rules implementing section 258—and conforming its preexisting anti-slamming regulations to the new statute—the Commission established various procedures that carriers must use to verify the subscriber's authorization to submit the preferred carrier change order. These procedures, which vary depending on how the carrier chooses to market its services, include obtaining the subscriber's written authoriza-

tion, or, if the carrier has solicited the subscriber over the telephone, using an independent third party to confirm the subscriber's preferred carrier change order and obtain "appropriate verification data (e.g., the subscriber's date of birth or social security number)." 47 C.F.R. § 64.1150(b), (d) (1999) (currently codified as amended at 47 C.F.R. § 64.1120(a)(1), (c)(1), (c)(3)). In all circumstances, however, Commission rules require that carriers obtain both "(i) Authorization from the subscriber, and (ii) Verification of that authorization in accordance with the procedures prescribed in this section." 47 C.F.R. § 64.1120(a)(1) (formerly codified at 47 C.F.R. § 64.1100(a)(1) (1999)).

In December 2000, the Commission issued a notice of apparent liability (NAL) to AT&T for several violations of section 258 and the Commission's anti-slamming regulations. *Notice of Apparent Liability for Forfeiture*, 16 F.C.C.R. 438 (2000). After considering AT&T's opposition to the NAL, the Commission found the company liable for eleven slamming incidents—including the two at issue in this case, in which AT&T, in the course of making telephone solicitations, changed the long-distance carriers of two sets of customers, Thomas Patterson and Tracie and Greg Ortega, without their authorization. *Order of Forfeiture*, 16 F.C.C.R. 8978 (2001). In both cases, AT&T argued that because it complied with the Commission's prescribed procedures for conducting independent third-party verification of carrier change orders, it made no difference that Patterson and the Ortegas later complained that they neither knew the individuals who agreed to change their service nor authorized those individuals to approve a change on their behalf. Rejecting this argument, the Commission ruled that "[a] carrier cannot comply with the Commission's verification procedures if it receives confirmation from an individual not authorized to make the change." *Id.* at 8985, ¶ 18 (footnote omitted). Then, acting pursuant to Communications Act section 503(b), which authorizes forfeiture penalties against any person who "willfully or repeatedly" fails to comply with the Act or Commission rules and regulations, 47 U.S.C. § 503(b), the Commission assessed a $40,000 forfeiture for each of these two incidents, as well as

for each of seven others, and $80,000 for two involving forged letters of authorization, which the Commission regards as "a particularly egregious form of slamming," *Notice of Apparent Liability*, 16 F.C.C.R. at 452, ¶ 31 (footnote omitted). The forfeiture penalties add up to $520,000. *Order of Forfeiture*, 16 F.C.C.R. at 8986, ¶ 20.

AT&T promptly paid the full amount of the forfeiture penalties, but at the same time filed a petition for limited reconsideration, asking the Commission to rescind the portion of the *Forfeiture Order* finding it liable for changing the Ortegas' and Patterson's long-distance carriers without their authorization. In its *Order on Reconsideration*, the Commission upheld its previous findings, noting that its anti-slamming rules "impose a strict liability standard," and that AT&T "ultimately must determine for itself how to ensure that no unauthorized changes occur." 16 F.C.C.R. 16,596, 16,597, ¶ 5, 16,599, ¶ 9. "Should AT&T's methods prove unsuccessful," the Commission concluded, "the company is liable for any resulting unauthorized changes." *Id.* at 16,599 ¶ 9 (footnote omitted). AT&T filed a petition for review in this court, contending that the Commission's requirement of actual customer consent exceeds the agency's statutory authority.

## II.

Before considering the merits of AT&T's challenge, we must address the Commission's argument that we lack jurisdiction over appeals from NAL forfeiture proceedings. The NAL procedure is just one of two ways in which the Commission may impose forfeiture penalties, each of which comes with a different set of jurisdictional requirements—differences that are relevant to the issue before us. *See generally Action for Children's Television v. FCC*, 59 F.3d 1249, 1253–54 (D.C. Cir. 1995) (describing the two forfeiture procedures).

Under the first and more formal procedure, the Commission provides notice to the alleged violator and affords it an opportunity for a hearing before an administrative law judge, who may then choose to impose forfeiture penalties. 47

U.S.C. § 503(b)(3)(A). The resulting forfeiture order is then subject to review in the court of appeals. *Id.* If the penalty remains unpaid once the forfeiture determination becomes final, the United States may bring a collection action in district court. *Id.* § 503(b)(3)(B).

Under the less formal NAL procedure at issue in this case, the Commission issues a notice of apparent liability to the alleged violator, affording it only the opportunity to show, in writing, why no forfeiture penalty should be imposed. *Id.* § 503(b)(4). The Commission may then issue an order directing payment of the proposed forfeiture, reducing the amount to be paid, or canceling the forfeiture altogether. 47 C.F.R. § 1.80(f)(4). If the order becomes final and the forfeiture subject refuses to pay, then Communications Act section 504(a) permits the Commission to refer the matter to the Department of Justice for commencement of a civil action to recover the forfeiture in a district court, where the forfeiture subject is entitled to a trial de novo. 47 U.S.C. § 504(a).

The Commission argues that unlike the formal hearing forfeiture process, where the Communications Act expressly gives courts of appeals jurisdiction to review forfeiture orders, the less formal NAL forfeiture proceedings are not subject to review in courts of appeals. The plain language of the Communications Act indicates otherwise. Section 402(a), the Act's general review provision, vests in courts of appeals exclusive jurisdiction over "[a]ny proceeding to enjoin, set aside, annul or suspend" or determine the validity of final Commission orders, 47 U.S.C. § 402(a); *see* 28 U.S.C. § 2342(1)—a category that includes forfeiture orders, *see Illinois Citizens Comm. for Broad. v. FCC*, 515 F.2d 397, 402 (D.C. Cir. 1974) (holding that the court of appeals has jurisdiction over a third party's challenge to a paid forfeiture order pursuant to section 402(a)). And although section 504(a) creates an exception to that general rule, that exception is, by its express terms, limited to government actions for the recovery of forfeiture penalties: Section 504(a) provides that NAL forfeitures "shall be *recoverable* ... in a civil suit in the name of the United States" brought in the district court, and that "any suit for the *recovery* of a forfeiture

imposed pursuant to the provisions of this chapter shall be a trial de novo." 47 U.S.C. § 504(a) (emphasis added). Because section 504(a) says nothing about district court jurisdiction where the forfeiture has already been recovered, it appears to leave court of appeals jurisdiction intact where, as here, the forfeiture subject has paid the assessed penalty.

Though the Commission agrees that section 504(a) deals only with challenges to unpaid forfeiture orders, it argues that section 504(a) nevertheless overrides section 402(a), albeit implicitly, for purposes of challenging paid forfeiture orders. For that proposition, the Commission relies on *Pleasant Broadcasting Co. v. FCC*, 564 F.2d 496 (D.C. Cir. 1977). Addressing the question of court of appeals jurisdiction over NAL forfeiture orders, *Pleasant Broadcasting* states that "section 504 of the Communications Act of 1934 vests exclusive jurisdiction in the district courts to review, in the first instance, licensee challenges to forfeiture orders." *Id.* at 497 (citation omitted). According to the Commission, *Pleasant Broadcasting* holds that section 504(a) vests exclusive jurisdiction in district courts for review of all forfeiture orders, paid or unpaid. And because section 504(a) contains no provision for post-compliance review, the Commission argues, *Pleasant Broadcasting* means that forfeiture subjects must either bring a pre-compliance challenge in district court or bring no challenge at all; payment effectively renders forfeiture orders unreviewable.

Despite its broad statement of its holding, *Pleasant Broadcasting* provides little support for the Commission's theory. To begin with, *Pleasant Broadcasting* deals not with the question of post-compliance review of forfeiture orders, but rather with a forfeiture subject's challenge to an *unpaid* forfeiture order. The court's reasoning reflects the importance of that distinction. Limiting its holding to cases in which section 504's "special review mechanism" is both adequate and available, the court distinguished *Illinois Citizens*, 515 F.2d 397, in which this court accepted jurisdiction over public-interest groups' challenge to a Commission forfeiture for broadcasting obscene and indecent materials despite the

fact that the broadcaster had already paid the penalty. Under those circumstances, where section 504 proceedings to collect the forfeiture "would never have been instituted," *Pleasant Broadcasting* says that section 504 review is "unavailable," and court of appeals review pursuant to section 402(a) is therefore "appropriate." *Id.* at 501, 502–03. Although *Illinois Citizens* involved a third-party challenge to a paid forfeiture order, the same logic applies when the forfeiture subject itself seeks to bring a post-compliance challenge: Because payment renders section 504 review "unavailable," court of appeals review pursuant to section 402(a) is "appropriate."

*Pleasant Broadcasting*'s holding, moreover, rests at least in part on the court's concern that allowing forfeiture subjects to bring challenges to forfeiture orders in courts of appeals would give them the proverbial "two bites at the apple": They would "be able to challenge the forfeiture order in a court of appeals on the basis of the administrative record and, if unsuccessful, . . . litigate all issues de novo in the district court, with a right of appeal to the court of appeals." *Id.* at 501. Even under the Commission's theory, that danger does not exist here. Because section 504(a) review is, by its terms, available only in recovery actions, AT&T will get just one bite.

In the end, *Pleasant Broadcasting* tells us only that section 504(a) establishes district courts as the exclusive forum for challenges to unpaid forfeiture orders. Like section 504(a) itself, it has no effect on court of appeals jurisdiction to review challenges to paid forfeiture orders.

To be sure, as the Commission points out, allowing forfeiture subjects to choose between challenging unpaid forfeiture orders in district court and challenging paid forfeiture orders in the court of appeals means that they can control the forum of review by deciding whether or not to pay the penalty. The obvious answer to this concern is section 504(a)'s plain language: By limiting district court jurisdiction to unpaid forfeitures, it gives forfeiture subjects that very choice. Such forum-controlling compliance choices, moreover, are common

in statutes providing for judicial review of regulatory decisions. The Communications Act itself contains another such provision, which allows telecommunications carriers subject to orders that conclude complaint-initiated investigations either to appeal the order in the court of appeals under section 402(a), 47 U.S.C. § 208(b)(3), or, assuming the order requires the payment of money, to refuse to comply and instead wait for the complainant to file a petition in district court, *id.* § 407.

Moreover, even where, as here, a statute fails to make the choice explicit, but rather provides only a special procedural mechanism for the government to collect payments owed to it, that choice nevertheless remains; the collection mechanism has no effect on the payer's ability to obtain post-compliance review pursuant to generally applicable jurisdictional principles. For example, in the customs context, where Congress granted exclusive jurisdiction to the Court of International Trade over suits for the recovery of certain civil penalties, 28 U.S.C. § 1582(1), penalty subjects may "obtain[ ] judicial review in the Court of International Trade by refusing to pay the penalty and waiting for the government to commence an enforcement action." *Trayco, Inc. v. United States*, 994 F.2d 832, 837 (Fed. Cir. 1993). But they also have "the option, and more importantly, the right" to pay the penalty and later "initiate suit in the district court to challenge the penalty" pursuant to the Tucker Act, 28 U.S.C. § 1346(a)(2). *Id.* Similarly, here, where AT&T has already paid the penalty rather than wait for the Government to commence a recovery action, it has the option—and the right—to initiate suit in the court of appeals pursuant to section 402(a).

## III.

This brings us to the merits of AT&T's challenge to the Commission's forfeiture order. Because AT&T claims that the anti-slamming regulations violate a statute the Commission is charged with enforcing, we proceed in accordance with *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), asking first whether "Congress has directly spoken to the precise question at issue," since if it

has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43 (footnote omitted). If the statute is either silent or ambiguous, we defer to the agency's interpretation, provided that it "is based on a permissible construction of the statute." *Id.* at 843. Such deference is warranted, however, only when "Congress has left a gap for the agency to fill pursuant to an express or implied 'delegation of authority to the agency.'" *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (citation omitted); *see also Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("[T]he agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue.") (emphasis in original).

Applying this standard, we believe that the anti-slamming regulations exceed the authority Congress delegated to the Commission in section 258. To begin with, the regulations go beyond the anti-slamming statute's express terms. Section 258 provides only that telecommunications carriers may not submit or execute changes in subscribers' telephone service "except in accordance with such verification procedures as the Commission shall prescribe," 47 U.S.C. § 258(a), yet the Commission's anti-slamming regulations require that a carrier not only comply with the Commission's verification procedures, but also obtain actual "[a]uthorization from the subscriber." 47 C.F.R. § 64.1120(a)(1). The distinction is important, for as AT&T points out, the Commission's actual-authorization requirement charges carriers that engage in telemarketing with a virtually impossible task: guaranteeing that the person who answers the telephone is in fact authorized to make changes to that telephone line. While a customer's current local exchange carrier might be able to verify the subscriber's identity by consulting its own customer records, the Commission itself has acknowledged that "long distance service providers often lack access to the [local exchange carrier] account records containing the pertinent information" about the customer of record. Third Report and Order and Second Order on Reconsideration, *Im-*

*plementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996*, 15 F.C.C.R. 15996, 16020, ¶ 49 n.145 (2000). Carriers, moreover, generally have no way of knowing whom subscribers may have authorized to make changes on their behalf. In other words, telecommunications carriers seeking new customers via telemarketing have little choice but to depend on the veracity of the person answering the phone. And as the Commission's forfeiture order in this case illustrates, carriers may follow all of the prescribed verification procedures yet still find themselves liable. The actual-authorization requirement amounts, as the Commission acknowledges, to a strict-liability standard. *Order on Reconsideration*, 16 F.C.C.R. at 16,597, ¶ 5.

Since section 258 itself contains no actual-authorization requirement, the question becomes whether it nevertheless authorizes the Commission to create such a requirement. We think it does not. If Congress had wished to require actual customer authorization, instead of prohibiting carriers from changing subscribers' service "except in accordance with such verification procedures as the Commission shall prescribe," it would have written the statute to prohibit such changes "without the authorization of the subscriber." Elsewhere in the Communications Act, Congress has expressly imposed an actual-authorization requirement. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 439–40 (2002) ("[I]t is a general principle of statutory construction that when one statutory section includes particular language that is omitted in another section of the same Act, it is presumed that Congress acted intentionally and purposely.") (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Section 222, for example, requires that telecommunications carriers obtain "approval of the customer" before using, disclosing, or permitting access to "individually identifiable" customer proprietary network information, except as otherwise required by law. 47 U.S.C. § 222(c)(1). It also requires the "express prior authorization of the customer" for the release of wireless location information. *Id.* § 222(f). By comparison, section 258(a) neither contains a customer-consent requirement nor suggests that Congress delegated to the Commission the discretionary au-

thority to adopt such a requirement. *Cf. Motion Picture Ass'n*, 309 F.3d at 801–02 (finding that a statute authorizing a study on the use of video description does not authorize the Commission to adopt rules mandating video description). It only authorizes the Commission to prescribe verification procedures.

Attempting to show that it has not exceeded this mandate, the Commission insists that the actual-authorization requirement is not an independent requirement, but rather an integral part of its "verification procedures." According to the Commission, its verification procedures require carriers not only to ask the right questions of their potential customers, but to ask the right questions of the right people—that "the third party verifier confirm the *subscribers'* authorization; obtain identification data from the *subscriber*; and within the verification context obtain clear and conspicuous confirmation that the *subscriber* authorized a change," where "subscriber" means the subscriber of record, and not merely the person who answers the phone. Respondents' Br. at 37–38 (emphasis in original). We are unconvinced. A "procedure" is "a particular course of action," or "a particular step adopted for doing or accomplishing something." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1807 (1993). So defined, "procedures" include, for example, referring telemarketing sales to independent third parties to confirm orders and to ask for identifying information such as subscribers' dates of birth. *See* 47 C.F.R. § 64.1120(a). In contrast, the Commission's actual-authorization requirement prescribes no "particular step . . . for doing or accomplishing something." Rather, it establishes a goal that the Commission itself has admitted may be impossible to accomplish—guaranteeing that the person on the phone actually has authority to make changes to the account—leaving carriers such as AT&T in the position of "determin[ing] for [themselves] how to ensure that no unauthorized changes occur," and holding them liable if those methods "prove unsuccessful." *Order on Reconsideration*, 16 F.C.C.R. at 16,599, ¶ 9.

Finally, the Commission argues that the actual-authorization requirement better serves Congress's purpose of protecting consumers from slamming by strengthening and

expanding the Commission's preexisting anti-slamming rules. In this case, however, where the statute's text is clear, we have no need to resort to section 258's legislative history. Rather, we think "Congress meant what it said"—carriers must comply with Commission verification procedures, and nothing more. *FCC v. NextWave Personal Communications Inc.*, 123 S. Ct. 832, 842 (2003).

## IV.

Having considered the Commission's remaining arguments and finding them to be without merit, we grant the petition for review and vacate the forfeiture penalties associated with the Ortega and Patterson accounts.

*So ordered.*