# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued April 6, 2006          Decided June 27, 2006

No. 05-5436

NATIONAL TREASURY EMPLOYEES UNION, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

MICHAEL CHERTOFF, SECRETARY,
UNITED STATES DEPARTMENT OF HOMELAND SECURITY
AND LINDA M. SPRINGER, DIRECTOR OF THE
OFFICE OF PERSONNEL MANAGEMENT,
APPELLANTS/CROSS-APPELLEES

―――

Consolidated with
05-5437

―――

Appeals from the United States District Court
for the District of Columbia
(No. 05cv00201)

―――

*Thomas M. Bondy*, Attorney, U.S. Department of Justice, argued the cause for appellants/cross-appellees. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, *Gregory G. Katsas*, Deputy Assistant Attorney General, *William G. Kanter*, Deputy Director, *Tara Leigh Grove*, Attorney, *Leland E. Beck*, Counsel, Department of Homeland Security, and *Mark A. Robbins*, *David*

*B. Scholl*, and *Robin M. Richardson*, Counsel, Office of Personnel Management.

*Gregory O'Duden* argued the cause for appellees/cross-appellants. With him on the briefs were *Elaine D. Kaplan, Larry J. Adkins, Robert H. Shriver, III, Mark D. Roth, Susan Tsui Grundmann, Kim D. Mann, Sally M. Tedrow, Robert Matisoff*, and *Keith R. Bolek. Charles A. Hobbie* entered an appearance.

Before: RANDOLPH and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

### ACRONYMS & ABBREVIATIONS IN OPINION

| | |
|---|---|
| Act | Homeland Security Act |
| Authority | Federal Labor Relations Authority |
| Chapter 71 | Codifies the Federal Services Labor-Management Statute |
| *Chertoff I* | The first District Court opinion at 385 F. Supp. 2d 1 (D.D.C. 2005) |
| *Chertoff II* | The second District Court opinion at 394 F. Supp. 2d 137 (D.D.C. 2005) |
| Department | Department of Homeland Security |
| DHS | Department of Homeland Security |
| Final Rule | DHS Human Resources Management System (at 5 C.F.R. Part 9701) |
| FLRA | Federal Labor Relations Authority |
| FSLMS | Federal Services Labor-Management Statute (codifying "Chapter 71") |
| HR system | The human resources management system adopted in Final Rule |
| HSA | Homeland Security Act |
| HSLRB | Homeland Security Labor Relations Board |
| MRP | Mandatory Removal Panel under the HR system |
| MSPB | Merit Systems Protection Board |

| | |
|---|---|
| OPM | Office of Personnel Management |
| regulations | The Final Rule (at 5 C.F.R. Part 9701) |
| Secretary | Secretary of Homeland Security |
| § 9701 | Statutory authorization for a human resources management system at DHS |

## TABLE OF CONTENTS

I.   Background

    A.   The Homeland Security Act

    B.   The Final Rule Adopting the HR System

        1.   Collective Bargaining

        2.   The Roles of the Homeland Security Labor Relations Board and the Federal Labor Relations Authority

        3.   The Role of the Merit Systems Protection Board

    C.   Litigation Before the District Court

II.  Analysis

    A.   Standing and Ripeness

    B.   Standard of Review

    C .  The Duty to Ensure Collective Bargaining

        1.   DHS's Asserted Power to Unilaterally Abrogate Collective Bargaining Agreements

        2.   The Scope of Bargaining

        3.   The Final Rule Fails to "Ensure Collective Bargaining" for DHS Employees in Two Critical Respects – Therefore No Deference is Due the Department's Interpretation of the HSA

    D.   The Role of the HSLRB

    E.   DHS's Attempt to Regulate FLRA

    F.   The Role of MSPB

    G.   The Scope of the Injunction

III. Conclusion

EDWARDS, *Senior Circuit Judge*:  When Congress enacted the Homeland Security Act of 2002 ("HSA" or the "Act") and established the Department of Homeland Security ("DHS" or the "Department"), it provided that "the Secretary of Homeland

Security may, in regulations prescribed jointly with the Director of the Office of Personnel Management, establish, and from time to time adjust, a human resources management system." 5 U.S.C. § 9701(a) (Supp. II 2002). Congress made it clear, however, that any such system "shall – (1) be flexible; (2) be contemporary; (3) not waive, modify, or otherwise affect [certain existing statutory provisions relating to, *inter alia*, merit hiring, equal pay, whistleblowing, and prohibited personnel practices], [and] (4) ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law." *Id*. § 9701(b)(1)-(4). The Act also mandated that DHS employees receive "fair treatment in any appeals that they bring in decisions relating to their employment." *Id.* § 9701(f)(1)(A). Section 9701 does not mention "Chapter 71," which codifies the Federal Services Labor-Management Statute ("FSLMS"), 5 U.S.C. §§ 7101-7106, 7111-7123, 7131-7135 (2000), and delineates the framework for collective bargaining for most federal sector employees.

In February 2005, the Department and Office of Personnel Management ("OPM") issued regulations establishing a human resources management system. *See* Department of Homeland Security Human Resources Management System, 70 Fed. Reg. 5272 (Feb. 1, 2005) (codified at 5 C.F.R. Chapter XCVII and Part 9701) ("Final Rule" or "HR system"). The Final Rule, *inter alia*, defines the scope and process of collective bargaining for affected DHS employees, channels certain disputes through the Federal Labor Relations Authority ("FLRA" or the "Authority"), creates an in-house Homeland Security Labor Relations Board ("HSLRB"), and assigns an appellate role to the Merit Systems Protection Board ("MSPB") in cases involving penalties imposed on DHS employees.

Unions representing many DHS employees (the "Unions") filed a complaint in District Court raising a cause of action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, to challenge aspects of the Final Rule. In a detailed and thoughtful opinion, *Nat'l Treasury Employees Union v. Chertoff*, 385 F. Supp. 2d 1 (D.D.C. 2005) ("*Chertoff I*"), the District Court found that the regulations would not ensure collective bargaining, would fundamentally and impermissibly alter FLRA jurisdiction, and would create an appeal process at MSPB that is not fair. Based on these rulings, the District Court enjoined DHS from implementing § 9701.706(k)(6) and all of Subpart E (§ 9701.501 *et seq.*) of the regulations. However, the District Court rejected the Unions' claims that the regulations impermissibly restricted the scope of bargaining and that DHS lacked authority to give MSPB an intermediate appellate function in cases involving mandatory removal offenses. The Government filed a motion to alter or amend the judgment, but the District Court denied that motion. *See Nat'l Treasury Employees Union v. Chertoff*, 394 F. Supp. 2d 137 (D.D.C. 2005) ("*Chertoff II*"). The case is now before this court on appeal by the Government and cross-appeal by the Unions. We affirm in part and reverse in part.

We hold that the regulations fail in two important respects to "ensure that employees may . . . bargain collectively," as the HSA requires. First, we agree with the District Court that the Department's attempt to reserve to itself the right to unilaterally abrogate lawfully negotiated and executed agreements is plainly unlawful. If the Department could unilaterally abrogate lawful contracts, this would nullify the Act's specific guarantee of collective bargaining rights, because the agency cannot "ensure" collective bargaining without affording employees the right to negotiate binding agreements.

Second, we hold that the Final Rule violates the Act insofar as it limits the scope of bargaining to employee-specific

personnel matters. The regulations effectively eliminate all meaningful bargaining over fundamental working conditions (including even negotiations over procedural protections), thereby committing the bulk of decisions concerning conditions of employment to the Department's exclusive discretion. In no sense can such a limited scope of bargaining be viewed as consistent with the Act's mandate that DHS "ensure" collective bargaining rights for its employees. The Government argues that the HSA does not require the Department to adhere to the terms of Chapter 71 and points out that the Act states that the HR system must be "flexible," and from this concludes that a drastically limited scope of bargaining is fully justified. This contention is specious. Although the HSA does not compel the Government to adopt the terms of Chapter 71 as such, Congress did not say that Chapter 71 is irrelevant to an understanding of how DHS is to comply with its obligations under the Act. "Collective bargaining" is a term of art and Chapter 71 gives guidance to its meaning. It is also noteworthy that the HSA requires that the HR system be "contemporary" as well as flexible. We know of no contemporary system of *collective bargaining* that limits the scope of bargaining to employee-specific personnel matters, as does the HR system, and the Government cites to none. We therefore reverse the District Court on this point.

We affirm the District Court's judgment that the Department exceeded its authority in attempting to conscript FLRA into the HR system. The Authority is an independent administrative agency, operating pursuant to its own organic statute and long-established procedures. Although the Department was free to avoid FLRA altogether, it chose instead to impose upon the Authority a completely novel appellate function, defining FLRA's jurisdiction and dictating standards of review to be applied by the Authority. In essence, the Final Rule attempts to co-opt FLRA's administrative machinery, prescribing new practices in an exercise of putative authority

that only Congress possesses. Nothing in the HSA allows DHS to disturb the operations of FLRA.

Finally, we reverse without prejudice the District Court's finding that DHS was without authority to change the standard by which the MSPB might mitigate a penalty for employee misconduct. This matter is not ripe for review.

The case will be remanded to the District Court for further proceedings consistent with this decision.

## I. BACKGROUND

### A. The Homeland Security Act

The Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002), was enacted in November 2002. It established the Department, a cabinet-level agency whose mission is to "prevent and deter terrorist attacks[,] protect against and respond to threats and hazards to the nation[,] . . . ensure safe and secure borders, welcome lawful immigrants and visitors, and promote the free-flow of commerce." Final Rule, 70 Fed. Reg. at 5273 (internal quotation marks omitted). The Act merged 22 existing agencies from across the federal government, integrating 170,000 employees, 17 unions, 7 payroll systems, 77 collective bargaining units, and 80 personnel systems. *See Chertoff I*, 385 F. Supp. 2d at 6 n.1 (quoting 148 CONG. REC. S11017 (Statement of Sen. Thompson) (Nov. 14, 2002)).

As noted above, HSA authorizes the Secretary of Homeland Security, with the Director of the Office of Personnel Management, to promulgate regulations establishing a HR system. *See* 5 U.S.C. § 9701 (Supp. II 2002). The Act reads in pertinent part as follows:

(a) IN GENERAL. – Notwithstanding any other provision of this part, the Secretary of Homeland Security may, in regulations prescribed jointly with the Director of the Office of Personnel Management, establish, and from time to time

adjust, a human resources management system for some or all of the organizational units of the Department of Homeland Security.

(b) SYSTEM REQUIREMENTS. – Any system established under subsection (a) shall –

(1) be flexible;

(2) be contemporary;

(3) not waive, modify, or otherwise affect –

   (A) the public employment principles of merit and fitness set forth in section 2301, including the principles of hiring based on merit, fair treatment without regard to political affiliation or other nonmerit considerations, equal pay for equal work, and protection of employees against reprisal for whistleblowing;

   (B) any provision of section 2302, relating to prohibited personnel practices;

   (C) (i) any provision of law referred to in section 2302(b)(1), (8), and (9); or (ii) any provision of law implementing any provision of law referred to in section 2302(b)(1), (8), and (9) by –

      (I) providing for equal employment opportunity through affirmative action; or

      (II) providing any right or remedy available to any employee or applicant for employment in the civil service;

   (D) any other provision of this part (as described in subsection (c)); or

   (E) any rule or regulation prescribed under any provision of law referred to in any of the preceding subparagraphs of this paragraph;

(4) ensure that employees may organize, bargain collectively, and participate through labor

organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law; and

(5) permit the use of a category rating system for evaluating applicants for positions in the competitive service.

* * * *

(f) PROVISIONS RELATING TO APPELLATE PROCEDURES. –

(1) SENSE OF CONGRESS. – It is the sense of Congress that –

(A) employees of the Department are entitled to fair treatment in any appeals that they bring in decisions relating to their employment; and

(B) in prescribing regulations for any such appeals procedures, the Secretary and the Director of the Office of Personnel Management – (i) should ensure that employees of the Department are afforded the protections of due process; and (ii) toward that end, should be required to consult with the Merit Systems Protection Board before issuing any such regulations.

(2) REQUIREMENTS. – Any regulations under this section which relate to any matters within the purview of chapter 77 –

(A) shall be issued only after consultation with the Merit Systems Protection Board;

(B) shall ensure the availability of procedures which shall – (i) be consistent with requirements of due process; and (ii) provide, to the maximum extent practicable, for the expeditious handling of any matters involving the Department; and

(C) shall modify procedures under chapter 77 only insofar as such modifications are designed to further the fair, efficient, and expeditious

resolution of matters involving the employees of the Department.

(g) PROVISIONS RELATING TO LABOR-MANAGEMENT RELATIONS. – Nothing in this section shall be construed as conferring authority on the Secretary of Homeland Security to modify any of the provisions of section 842 of the Homeland Security Act of 2002.

*Id.* § 9701(a)-(b) &(f)-(g).

As may be seen from the text of the Act, § 9701 says little about the substantive terms of the HR system. Notably, however, the Act mandates that any HR system "ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them." *Id.* § 9701(b)(4) (Supp. II 2002).

## B. The Final Rule Adopting the HR System

On February 1, 2005, DHS and OPM promulgated the Final Rule establishing the new HR system. *See* Final Rule, 70 Fed. Reg. 5272. Although the HR system was established by DHS and OPM, we will refer only to "DHS" or the "Department" as the author of the regulations. (The District Court referred to DHS and OPM collectively as the "Agencies.") Our discussion of the Final Rule will be limited to the portions of the regulations at issue in this case, *i.e.*, Subpart E (5 C.F.R. § 9701.501 *et seq.*), which governs labor relations at DHS, and Subpart G (5 C.F.R. § 9701.701 *et seq.*), which addresses employee appeals.

### 1. *Collective Bargaining*

As the District Court noted, the Final Rule "contain[s] an expansive management rights provision and severely restrict[s] collective bargaining to issues that affect individual employees." *Chertoff I*, 385 F. Supp. 2d at 9. Collective bargaining under the new HR system is defined to mean "the performance of the mutual obligation of a management representative of the

Department and an exclusive representative of employees . . . to meet at reasonable times and to consult and bargain in a good faith effort to reach agreement with respect to the conditions of employment affecting such employees." 5 C.F.R. § 9701.504 (2006). Most "conditions of employment," however, are placed off-limits for bargaining. Thus, the Final Rule states:

> nothing in this subpart may affect the authority of any management official or supervisor of the Department –
>
> (1) To determine the mission, budget, organization, number of employees, and internal security practices of the Department;
>
> (2) To hire, assign, and direct employees in the Department; to assign work, make determinations with respect to contracting out, and to determine the personnel by which Departmental operations may be conducted; to determine the numbers, types, grades, or occupational clusters and bands of employees or positions assigned to any organizational subdivision, work project or tour of duty, and the technology, methods, and means of performing work; to assign and deploy employees to meet any operational demand; and to take whatever other actions may be necessary to carry out the Department's mission; and
>
> (3) To lay off and retain employees, or to suspend, remove, reduce in grade, band, or pay, or take other disciplinary action against such employees or, with respect to filling positions, to make selections for appointments from properly ranked and certified candidates for promotion or from any other appropriate source.

*Id.* § 9701.511(a). In addition, management "is prohibited from bargaining over the exercise of any authority under paragraph (a) of this section or the procedures that it will observe in

exercising the authorities set forth in paragraphs (a)(1) and (2) of this section." *Id.* § 9701.511(b).

The Final Rule states that management must bargain over

(1)  Appropriate arrangements for employees adversely affected by the exercise of any authority under paragraph (a)(3) of this section and procedures which management officials and supervisors will observe in exercising any authority under paragraph (a)(3) of this section; and

(2)  (i) Appropriate arrangements for employees adversely affected by the exercise of any authority under paragraph (a)(1) or (2) of this section, provided that the effects of such exercise have a significant and substantial impact on the bargaining unit, or on those employees in that part of the bargaining unit affected by the action or event, and are expected to exceed or have exceeded 60 days. Appropriate arrangements within the duty to bargain include proposals on matters such as –

(A)  Personal hardships and safety measures;  and

(B)  Reimbursement for out-of-pocket expenses incurred by employees as the direct result of the exercise of authorities under this section.

*Id.* § 9701.511(e)(1)-(2)(i).  However, "[a]ppropriate arrangements within the duty to bargain do not include proposals on such matters as – (A) [t]he routine assignment to specific duties, shifts, or work on a regular or overtime basis; and (B) [c]ompensation for expenses not actually incurred, or pay or credit for work not actually performed." *Id.* § 9701.511(e)(2)(ii).

In analyzing the provisions of 5 C.F.R. § 9701.511, the District Court wryly commented:

> Translated into English, this Regulation would give management full discretion over all aspects of the Department except those that might be seen as personal employee grievances.

*Chertoff I*, 385 F. Supp. 2d at 10.

The new HR system also authorizes the Department to unilaterally abrogate lawfully negotiated and executed collective bargaining agreements. In addition to securing DHS's authority to override agreements that are in existence when the HR system takes effect, *see* 5 C.F.R. § 9701.506(a) (2006), the Final Rule purports to authorize the Department to unilaterally set aside provisions in agreements that are negotiated and executed under the new HR system. An agreement may be invalidated by DHS's Secretary (or a designee) within 30 days of being executed if found to be inconsistent with Departmental rules or regulations. *Id.* § 9701.515(d)(1)-(2). Even if not explicitly disapproved, an agreement takes effect "only if consistent with law, the regulations in this part, Governmentwide rules and regulations, Departmental implementing directives and other policies and regulations, and Executive orders." *Id.* at 9701.515(d)(3).

The Final Rule also gives DHS ongoing authority to abrogate agreements after they take effect:

> Provisions in existing collective bargaining agreements are unenforceable if an authorized agency official determines that they are contrary to law, the regulations in this part, Governmentwide rules and regulations, Departmental implementing directives (as provided by § 9701.506) and other policies and regulations, or Executive orders.

*Id.* § 9701.515(d)(5). Moreover, as noted above, the "management rights" provision in the Final Rule authorizes the Department "to take whatever other actions may be necessary to carry out the Department's mission." *Id.* § 9701.511(a)(2).

Taken together, these regulations subordinate all collective bargaining agreements to the prerogatives of management. *See Chertoff I*, 385 F. Supp. 2d at 11 ("The Agencies acknowledge that these provisions would allow DHS to reject any term of a collective bargaining agreement negotiated under the new HR System if a subsequent implementing directive or other policy or regulation were deemed inconsistent.").

### 2. *The Roles of the Homeland Security Labor Relations Board and the Federal Labor Relations Authority*

The Federal Labor Relations Authority is an independent administrative federal agency that was created by Title VII of the Civil Service Reform Act of 1978, also known as the Federal Service Labor-Management Relations Statute and "FSLMRS", 5 U.S.C. § 7101 *et. seq.* (2000). The FSLMRS allows certain non-postal federal employees to organize, bargain collectively, and participate through labor organizations of their choice in decisions affecting their working lives. The primary statutory responsibilities of FLRA include: (1) resolving complaints of unfair labor practices, (2) determining the appropriateness of units for labor organization representation, (3) adjudicating exceptions to arbitrator's awards, (4) adjudicating legal issues relating to duty to bargain/negotiability, and (5) resolving impasses during negotiations. *Id*. § 7105(a)(2).

The HSA does not specify a role for FLRA under the HR system. The Authority's jurisdiction is limited to actions brought pursuant to the FSLMRS. *Id.* DHS and many of its employees are within the purview of the Authority's jurisdiction. *See* 5 U.S.C. §§ 7103(a)(2)(A) (2000) (defining "employees" covered by the FSLMRS as individuals employed in agencies), 7103(a)(3) (listing agencies that are excluded from coverage under the FSLMRS). The Authority's jurisdiction to hear matters affecting DHS employees is limited, however, to the extent that the Final Rule supplants the substantive provisions of the FSLMRS pursuant to § 9701 of the HSA.

15

The Final Rule establishes the Homeland Security Labor Relations Board, composed of a rotating board of members – appointed by the Secretary of Homeland Security – who "must be independent, distinguished citizens of the United States who are well known for their integrity and impartiality" and have "expertise in labor relations, law enforcement, or national/homeland or other related security matters." 5 C.F.R. § 9701.508(a)(2) (2006). The regulations empower HSLRB to, *inter alia*, (1) resolve issues relating to the scope of bargaining under the regulations and the duty to bargain in good faith, (2) conduct hearings and resolve complaints of unfair labor practices, (3) resolve exceptions to arbitration awards involving the exercise of management rights and the duty to bargain, (4) resolve negotiation impasses, (5) conduct *de novo* review of legal conclusions involving all matters within its jurisdiction, and (6) assume jurisdiction over any matter concerning DHS employees that has been submitted to FLRA "if the HSLRB determines that the matter affects homeland security." *Id.* § 9701.509(a). The regulations also authorize HSLRB to "issue binding Department-wide opinions," *id.* § 9701.509(b), which may be subject to judicial review pursuant to 5 C.F.R. § 9701.508(h), *id.* There is no doubt that the HSLRB was created to supplant FLRA with respect to many matters that would otherwise be within the Authority's jurisdiction.

Although the Final Rule obviously was adopted to replace many of the substantive provisions of the FSLMRS, the regulations nonetheless purport to create a limited role for FLRA *under the HR system*. The Final Rule provides that any party who wishes to obtain judicial review of a HSLRB decision must first seek FLRA review. *Id.* § 9701.508(h). But the Authority's role is tightly circumscribed:

> The Authority must defer to findings of fact and interpretations of this part made by the HSLRB and sustain

the HSLRB's decision unless the requesting party shows that the HSLRB's decision was –

> (i) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (ii) Based on error in applying the HSLRB's procedures that resulted in substantial prejudice to a party affecting the outcome; or
>
> (iii) Unsupported by substantial evidence.

*Id.* The Final Rule also purports to give FLRA limited authority to determine the appropriateness of bargaining units within DHS, supervise or conduct elections, adjudicate some unfair labor practice disputes, and resolve some exceptions to arbitral awards. *Id.* § 9701.510(a). However, HSLRB "[a]ssume[s] jurisdiction over any matter concerning Department employees that has been submitted to FLRA . . . if the HSLRB determines that the matter affects homeland security." *Id.* § 9701.509(b)(7). And the Final Rule confers sole authority on HSLRB to determine whether a particular matter "affects homeland security" or otherwise belongs on HSLRB's docket. *Id.* § 9701.510(b).

### 3. *The Role of the Merit Systems Protection Board*

Normally, Chapter 77 allows federal employees to appeal adverse actions to the MSPB. As noted above, the HSA states that DHS employees must receive due process in pursuing their appeals, and that any modification of Chapter 77 by DHS must be crafted in consultation with MSPB. 5 U.S.C. § 9701(f) (Supp. II 2002). The Act also states that regulations "which relate to any matters within the purview of chapter 77 . . . shall modify procedures under chapter 77 only insofar as such modifications are designed to further the fair, efficient, and expeditious resolution of matters involving the employees of the Department." *Id.* § 9701(f)(2)(C).

MSPB's role under the HR system is sharply limited. The regulations significantly diminish MSPB's ability to mitigate penalties imposed on employees. As DHS acknowledges, normally, when MSPB reviews an agency's penalty decision under Chapter 77, it seeks to determine "not only whether [the penalties] were too harsh or otherwise arbitrary but also whether they were unreasonable under all the circumstances." *See* Final Rule, 70 Fed. Reg. at 5281 (discussing *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981)). The Final Rule imposes a narrower role for MSPB, stating that "MSPB may not modify the penalty imposed by the Department unless such penalty is so disproportionate to the basis for the action as to be wholly without justification." 5 C.F.R. § 9701.706(k)(6) (2006).

The Final Rule also defines a new class of "mandatory removal offenses" for DHS employees. A mandatory removal offense is "an offense that the Secretary determines in his or her sole, exclusive, and unreviewable discretion has a direct and substantial adverse impact on the Department's homeland security mission." *Id.* § 9701.703. Appeals of mandatory removal actions are heard by DHS's Mandatory Removal Panel ("MRP"). *Id.* § 9701.707(a). An employee may only obtain judicial review of a mandatory removal action after first seeking review before the MRP. *Id.* § 9701.707(c)(1). When MSPB reviews an MRP decision, it "must accept the findings of fact and interpretations of this part made by the MRP and sustain the MRP's decision unless the employee shows" that the underlying decision was:

(i) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(ii) Caused by harmful error in the application of the MRP's procedures in arriving at such decision; or

(iii) Unsupported by substantial evidence.

*Id.* MSPB is allotted a limited time in which to review MRP decisions, and if "MSPB does not issue a final decision within the mandatory time limit . . . MSPB will be considered to have denied the request for review of the MRP's decision, which will constitute a final decision of MSPB" for purposes of judicial review. *Id.* § 9701.707(c)(2)-(4).

## C. Litigation Before the District Court

As soon as DHS issued its Final Rule, the Unions filed suit. Their complaint contained four counts. First, they claimed that the regulations violated the HSA by failing to ensure collective bargaining rights. Second, the Unions argued that DHS exceeded its authority under the HSA by fundamentally transforming the role of FLRA. Third, they claimed that the regulations violated § 9701(f)(2)'s requirement that the personnel system provide "fair" appellate procedures. And finally, the Unions argued that no statutory authority allowed the regulations to grant MSPB intermediate appellate duties in MRP cases.

On August 12, 2005, the District Court issued a decision addressing DHS's motion to dismiss and the Unions' motion for summary judgment. The court rejected DHS's claims that the Unions lacked standing to challenge certain regulations and that some of their claims were unripe. *Chertoff I*, 385 F. Supp. 2d at 17-22. The District Court then posited that the "*sine qua non* of good-faith collective bargaining is an enforceable contract once the parties reach an agreement." *Id.* at 25. The court found that the Final Rule flouted this standard by allowing DHS to unilaterally abrogate agreements. The District Court tellingly noted:

> A contract that is not mutually binding is not a contract. Negotiations that lead to a contract that is not mutually binding are not true negotiations. A system of "collective

bargaining" that permits the unilateral repudiation of agreements by one party is not collective bargaining at all.

*Id.* at 28. The court thus concluded that the Department was owed no deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), on this point.

The District Court declined to accept the Unions' argument that the Final Rule impermissibly restricted the scope of bargaining, however. Although the court agreed that the regulations' "eradication of virtually all bargaining over 'operational' issues will have a dramatic effect upon the work lives of the employees the [Unions] represent," it nonetheless found that "Congress gave the [Department] the authority to ignore the provisions of Chapter 71 and to establish new metes and bounds for collective bargaining at DHS." 385 F. Supp. 2d at 28-29 (internal quotation marks omitted).

Similarly, the District Court rejected the Unions' opposition to the HSLRB and their claim that the HR system failed to provide adequate review by a neutral arbiter. The court found that, "by deliberately and clearly giving the [Department] the authority to establish an HR System for DHS without reference to the FLRA or any other adjudicative system for labor-management disputes, Congress left it to the Executive Branch to formulate that system." *Id.* at 29.

The District Court sustained the Unions' objections to the role assigned to FLRA by the Final Rule. On this point, the court held that DHS could not "commandeer the resources of an independent agency and thereby fundamentally transform its functions, absent a clearer indication of congressional intent." *Id.* at 32.

The District Court also found that the Final Rule violated § 9701(f)(2) of the HSA, because the restrictions on MSPB review "result[ ] in a system that is not fair." *Id.* at 35. The

court found that, because the Final Rule specified that MSPB could modify penalties only when they are "so disproportionate as to be wholly without justification," 5 C.F.R. § 9701.706(k)(6) (2006), review would become "almost a nullity." 385 F. Supp. 2d at 35. And, "since it is the MSPB decision that goes to the Federal Circuit and not the employing agency decision," the District Court felt that DHS adverse actions would be effectively insulated from meaningful review. *Id.* The District Court therefore found that the Final Rule failed to abide the plain meaning of the HSA.

Finally, the District Court rejected the Unions' claim challenging the assignment to MSPB of an intermediate appellate function in cases involving mandatory removal offenses. The court found that "Congress authorize[d] the [Department] to modify the internal regulations of MSPB," and, therefore, DHS's "interpretation of the HSA to that effect is entitled to *Chevron* deference." *Id.* at 36.

The District Court enjoined the Department from enforcing Subpart E and one section of Subpart G (5 C.F.R. § 9701.706(k)(6)). It invited DHS, however, to submit a proposed order that would "more selectively enjoin[ ] Subpart E in a manner otherwise comporting with [the court's] memorandum opinion." *Id.* at 38. The Department then filed a motion to alter or amend the District Court's judgment under Federal Rule of Civil Procedure 59(e). The Department sought to have the court limit its injunction to five discrete subsections of Subpart E. The District Court denied the motion:

> Having given the Court's ruling the most narrow of interpretations, the [Department] argue[s] that the remainder of Subpart E is severable from five specific regulations they state were held to be invalid. The principal flaw in this argument is that the Court disallowed all parts of the Regulations that allow the unilateral repudiation of lawful contracts – whether by issuance of directives,

policies and rules, or other means. Inasmuch as there are significant additional avenues by which DHS would allow itself to ignore its contractual obligations, and the [Department] suggest[s] no modification to those regulatory provisions that would bring the Regulations into conformity with the Court's ruling, the Court declines to modify its August 12, 2005, Memorandum Opinion and Order.

*Chertoff II*, 394 F. Supp. 2d at 147.

DHS now appeals the District Court's judgment insofar as it holds that aspects of the HR system are inconsistent with the HSA. The Department also argues that, even if the District Court's legal rulings stand, a more narrow injunction is appropriate. The Unions cross-appeal three of the District Court's determinations: its denial of the Unions' claim that the regulations impermissibly restrict the scope of bargaining, its conclusion sustaining the role of HSLRB, and its finding that the expanded role of MSPB under the regulations is entitled to deference.

## II. ANALYSIS

### A. Standing and Ripeness

As an initial matter, the Government argues that some of the Unions' claims are not presently justiciable, either for want of standing or ripeness. The Government does "not dispute that the . . . unions have standing, as parties likely to engage in collective bargaining in the near future, to challenge the management rights provisions restricting the range of topics for bargaining." DHS's Br. at 28 n.5. The Government "also do[es] not dispute that the . . . unions have standing, as parties likely to appear before the HSLRB and the FLRA in the near future, to challenge the roles of these administrative bodies under the new DHS scheme." *Id.* Rather, the Government argues that the Unions lack standing to challenge the terms of the Final Rule covering collective bargaining, because "it is entirely unclear how DHS

will exercise the authority conferred by these provisions." *Id*. at 27. According to the Government, "DHS may conclude that it rarely (if ever) needs to issue additional regulations or implementing directives that are inconsistent with collective bargaining agreements. Likewise, DHS may rarely (if ever) act contrary to collective bargaining agreements in exercising its authority to take actions necessary to carry out its mission." *Id.* at 27. Thus, the Government says, "DHS's mere reservation of discretionary authority to take certain kinds of actions in the future does not give rise to a presently justiciable controversy." *Id.* The Government also argues that the Unions "lack standing to challenge the 'wholly without justification' standard (5 C.F.R. § 9701.706(k)(6)) used in MSPB review of DHS penalty determinations. That standard is not self-defining, and it remains to be seen how the MSPB will flesh it out in actual cases." DHS's Br. at 28.

The Unions surely have standing to challenge the provisions in the Final Rule covering collective bargaining, and their claims surely are ripe for review. As the District Court explained, standing to invoke the jurisdiction of the federal courts under Article III of the Constitution requires the Unions to show that they have (1) "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). A Union can assert standing on behalf of itself as an institution or on behalf of its members. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996) ("[A]n association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks

to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.") (quoting *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Am. Library Ass'n v. FCC*, 401 F.3d 489, 492-93 (D.C. Cir. 2005) (explaining the requirements of associational and representational standing). The Unions easily meet these standards.

The District Court correctly explained that the Unions' claim does not depend on any particular act of abrogation. Rather, their bargaining position in all negotiations is fundamentally diminished, because they will be unable to ever reach a mutually binding contract. *Chertoff I*, 385 F. Supp. 2d at 22. The District Court's decision also details how the Final Rule "eliminates all bargaining over what were formerly 'permissive' subjects – the Regulations actually prohibit bargaining over such topics as numbers, types, and grades of employees assigned to any subdivision or work project; tours of duty; technology; and means and methods of doing work. *Compare* 5 C.F.R. § 9701.511(a)(2) (2006), *with* 5 U.S.C. § 7106(b)(1) (2000). Further, the Regulations would permit DHS to avoid bargaining with the Unions over the procedures management will observe when exercising its management rights." *Chertoff I*, 385 F. Supp. 2d at 28. Obviously, the regulations will greatly diminish the role of the Unions in collective negotiations, for they have very little about which to bargain. And the Final Rule limits the possible fruits of bargaining for the employees who are represented by the Unions. These harms are far from conjectural and they will be remedied if the Unions prevail on their claims here.

The Unions also convincingly explain the "immediate practical impact" of the Final Rule on their organizations and their members:

> The Unions cannot effectively formulate strategies or evaluate tradeoffs to secure concessions from DHS because DHS (and even individual managers and supervisors) could later neutralize any concessions DHS had made at the table. As the district court understood, it does not matter whether DHS actually declares a contract clause unenforceable next month or three years from now. It is the change wrought on the bargaining process itself by the presence of these powers that causes immediate injury to the Unions.

Unions' Br. at 28-29 (citations and internal quotation marks omitted); *see also Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) (noting earlier holding that "a denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result") (citing *N.E. Fla. Ch., Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)).

It does not matter that "DHS may rarely (if ever) act contrary to collective bargaining agreements in exercising its authority to take actions necessary to carry out its mission." DHS's Br. at 27. What matters is that, under the proposed HR system, the Unions will enter collective bargaining with little to bargain over, and they will face an ever-present threat that DHS will abrogate any agreement that they reach with management. This harm to their bargaining position is certainly a real injury that is fairly traceable to the Final Rule and would be redressed by a favorable ruling.

The Unions' challenge to the provisions in the Final Rule covering collective bargaining is also ripe for review. In evaluating ripeness, we examine the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbot Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Gauging an issue's fitness for review involves assessing: "whether the agency action is final; whether the issue presented for decision is one of law which requires no additional

factual development; and whether further administrative action is needed to clarify the agency's position." *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986). None of these considerations counsels against evaluating the collective bargaining provisions now.

As with its challenge to standing, the Government argues that the Unions' challenge to the collective bargaining provisions is unfit for immediate review, because the Department may never choose to override an agreement. This argument is specious. As noted above, whether DHS ever chooses to displace the *outcome* of collective bargaining is irrelevant to the ripeness inquiry, since the Unions cite a threat to the *process* of collectively bargaining. The Unions' argument that collective bargaining cannot occur without an *ex ante* presumption of mutual obligation is entirely independent of any injury that might occur if the Department eventually exercises its discretion to vitiate an agreement. Accordingly, waiting to observe DHS's actions would only exacerbate the Unions' asserted injury while doing nothing to enable judicial review. *See Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (a purely legal challenge to final agency action is not unfit for review merely because the application of the disputed rule remains within the agency's discretion).

There is also no doubt that the Unions' challenge to the limited scope of bargaining under the Final Rule is ripe. There is no further agency action to be taken with respect to this matter. The Final Rule states, without equivocation, that certain subjects are not subject to collective bargaining. The Unions' challenge to these regulatory limits raises "a purely legal claim in the context of a facial challenge . . . [that] is 'presumptively reviewable.'" *Id.*

Finally, the Government asserts that the Unions lack standing to challenge MSPB's role in penalty mitigation cases.

While we reject the Government's standing argument, we agree that the asserted defects in MSPB's penalty mitigation procedures are not yet ripe for review. "[A] purely legal claim may be less fit for judicial resolution when it is clear that a later as-applied challenge will present the court with a richer and more informative factual record." *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005). Although determining whether the penalty mitigation standard comports with the HSA's requirement of "fair" appellate procedures presents a purely legal question, it is a question that will "stand on a much surer footing in the context of a specific application of [the] regulation than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).

And there is no real hardship to the Unions in deferring any challenge to the penalty mitigation procedures. The disputed procedures do not have any "direct and immediate" impact on the Unions' "primary conduct." *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92, 93 (D.C. Cir. 1986). And the "mere uncertainty as to the validity of a legal rule [does not constitute] a hardship for purposes of the ripeness analysis." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003). Indeed, nothing in the disputed penalty mitigation procedures purports to regulate the primary conduct of DHS employees, nor do the procedures modify the potential penalties available to DHS in the first instance. Problems with MSPB's review will arise only after DHS has disciplined an employee and the penalty has been appealed. *See* 5 C.F.R. § 9701.707 (2006). Any challenges to the procedures will then be ripe for review.

**B. Standard of Review**

As noted above, the HSA provides that "the Secretary of Homeland Security may, in regulations prescribed jointly with the Director of the Office of Personnel Management, establish, and from time to time adjust, a human resources management

system." 5 U.S.C. § 9701(a) (Supp. II 2002). The authority granted to the Department by the HSA is not without limits, however. Congress made it clear that any HR system adopted pursuant to the HSA "shall – (1) be flexible; (2) be contemporary; (3) not waive, modify, or otherwise affect [certain existing statutory provisions relating to, *inter alia*, merit hiring, equal pay, whistleblowing, and prohibited personnel practices], [and] (4) ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law." *Id.* § 9701(b)(1)-(4). The HSA also mandates that DHS employees receive "fair treatment in any appeals that they bring in decisions relating to their employment." *Id.* § 9701(f)(1)(A).

The question here is whether the disputed portions of the HR system adhere to the limitations imposed by § 9701. In particular, we must determine whether, in promulgating the Final Rule, DHS reasonably interpreted the controlling provisions of the HSA. In reviewing the Department's interpretations of the Act, we apply the familiar standards enunciated by the Supreme Court in *Chevron* and *United States v. Mead Corp.*, 533 U.S. 218 (2001). Under these standards, we first employ the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue. *Chevron*, 467 U.S. at 842-43 & n.9. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the Agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. However, where a statute is ambiguous and the agency has acted within its delegated authority, we will defer to the agency's interpretation only if it is reasonable. *Am. Library Ass'n. v. FCC*, 406 F.3d 689, 698-99 (D.C. Cir. 2005) (citing *Chevron*, 467 U.S. at 843-44).

An "agency's interpretation of [a] statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue." *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002). The Court's decision in *Mead* reiterates the command in *Chevron* that deference to an agency's interpretation of a statute is due only when the agency acts pursuant to delegated authority. *Mead*, 533 U.S. at 226-27; *see also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 399 (D.C. Cir. 2004); *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004); *AT&T Corp. v. FCC*, 323 F.3d 1081, 1086 (D.C. Cir. 2003).

*Chevron* "requires a reviewing court to ask . . . whether an agency's *specific course of action* is permitted by statute. It is possible that a statute might grant an agency authority to act in some fashion, but not in the particular manner it has chosen." *Arent v. Shalala*, 70 F.3d 610, 619 n.1 (D.C. Cir. 1995) (Wald, J., concurring). This point is particularly important here, because the Unions do not question DHS's authority to promulgate regulations defining collective bargaining; they contend instead that the specific regulatory standards selected by the Department to narrow the scope of bargaining and allow for the unilateral abrogation of agreements do not give effect to the HSA's command to "ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them." 5 U.S.C. § 9701(b)(4) (Supp. II 2002). Likewise, the Unions do not doubt that the Department could have opted to have disputes arising under the HR system be resolved by FLRA pursuant to the terms of the Federal Services Labor-Management Statute (Chapter 71); rather, they contend that DHS had no authority to conscript the Authority to function under the HR system on terms defined by the Department.

**C. The Duty to Ensure Collective Bargaining**

In a vain effort to defend the Final Rule's construction of a purported structure for collective bargaining, the Government points to § 9701(a), which says that the Department is authorized to promulgate a HR system "[n]otwithstanding any other provision of this part," and § 9701(b)(3), which says that any such system "shall – . . . (3) not waive, modify, or otherwise affect [certain existing statutory provisions relating to, *inter alia*, merit hiring, equal pay, whistleblowing, and prohibited personnel practices]." The Government appears to argue that, read together, these two provisions authorize DHS to waive any provision relating to employee relations, save those specifically listed in § 9701(b)(3), and then to do entirely as it pleases in establishing a HR system. This argument is completely unconvincing. When § 9701 is read in its entirely, it is absolutely clear that DHS does not have a free hand to construct a HR system entirely as it prefers. The HSA does not require the Department to adopt any existing human resources management system, but it does specify "system requirements" that DHS must follow in promulgating a HR system. *See id.* § 9701(b). Thus, the system must be "flexible" and "contemporary," *id.* § 9701(b)(1)-(2); it must comply with certain provisions of law, *id.* § 9701(b)(3); and, it must include several substantive features, including "ensur[ing] that employees may . . . bargain collectively," *id.* § 9701(b)(4). In other words, DHS's discretion to establish "a human resources management system for some or all of the organizational units of the Department of Homeland Security," *id.* § 9701(a), is limited by all of the requirements listed in § 9701(b). Most importantly, at least with respect to the issues in this case, when Congress added the substantive requirement in the HSA guaranteeing DHS employees the right to bargain collectively, it obviously intended for this requirement to be construed reasonably and applied fully.

Although the HSA requires the Department to "ensure" that their employees may bargain collectively, the Act does not define collective bargaining. Fortunately, this is not a term without meaning. Indeed, "collective bargaining" is a term of art in the federal sector that has been defined by Congress in the FSLMS:

> "[C]ollective bargaining" means the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees in an appropriate unit in the agency to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession.

5 U.S.C. § 7103(a)(12) (2000). The Government's incantation of the truism that collective bargaining "is not a static concept with a fixed meaning in all circumstances," DHS's Br. at 32, is thus beside the point. In the context of federal sector labor-relations, collective bargaining is a term of art with a well-established statutory meaning. The Department presumably understood this, because its Final Rule adopts essentially the same definition as the one in the FSLMS:

> *Collective bargaining* means the performance of the mutual obligation of a management representative of the Department and an exclusive representative of employees in an appropriate unit in the Department to meet at reasonable times and to consult and bargain in a good faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the

> obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession.

5 C.F.R. § 9701.504 (2006). And "collective bargaining agreement" is defined in nearly identical terms in the FSLMS and under the Final Rule, as "an agreement entered into as a result of collective bargaining pursuant to the provisions of this subpart." *Compare* 5 U.S.C. § 7103(a)(8) (2000), *with* 5 C.F.R. § 9701.504 (2006).

There is a presumption that Congress uses the same term consistently in different statutes. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) (emphasizing the "premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes"); *see also Hawaiian Airlines v. Norris*, 512 U.S. 246, 254 (1994); *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503, 1513 (2006) ("[W]hen 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'") (quoting *Bragdon v. Abbot*, 524 U.S. 624, 645 (1998)) (ellipsis in original). Given the parallel provisions in the FSLMS, the HSA, and the Final Rule, it is clear that "collective bargaining" under the HSA gains meaning from the application of that same term under Chapter 71. Indeed, these parallel provisions give "a strong indication" that the common term should be construed consistently under each statute. *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n.2 (1989); *see also Kooritzky v. Herman*, 178 F.3d 1315 (D.C. Cir. 1999) (similar language in two different statutes is strong indication that the language is to be interpreted alike).

The Government argues that the Department was free to "modify the collective bargaining provisions" of Chapter 71 in

promulgating a new HR system pursuant to the HSA. DHS's Br. at 31. This is undoubtedly correct. But nothing in the HSA suggests that the meaning of "collective bargaining" under Chapter 71 could be disregarded by the Department in its promulgation of the HR system. There are many "provisions" relating to collective bargaining in Chapter 71 – *e.g.*, resort to FLRA, determination of appropriate units, handling of refusal-to-bargain complaints, exceptions to arbitral awards, and use of an impasses panel – that the Department was free to ignore in its Final Rule. The core meaning of "collective bargaining" itself, however, could not be ignored or supplanted. Why? Because the HSA states explicitly that, in establishing a new HR system, the Department "shall"

> ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law.

5 U.S.C. § 9701(b)(4) (Supp. II 2002). This statutory obligation is mandatory, not optional. And if, as shown above, "collective bargaining" means the same thing under both the HSA and the FSLMS, then application of the term under the latter statute cannot possibly be irrelevant to an understanding of how the term applies under the former.

With these considerations in mind, we now review the provisions of the Final Rule to determine whether the Department's regulations "ensure that employees may . . . bargain collectively," as the HSA requires. The obvious problem with the HR system is that very few "conditions of employment" are subject to meaningful bargaining, and the few conditions over which the parties can negotiate may be unilaterally abrogated by management. A system of this sort does not even give an illusion of collective bargaining.

### 1. *DHS's Asserted Power to Unilaterally Abrogate Collective Bargaining Agreements*

The most extraordinary feature of the Final Rule is that it reserves to the Department the right to unilaterally abrogate lawfully negotiated and executed agreements. This is plainly impermissible under the HSA. If the Department could unilaterally abrogate lawful contracts, this would nullify the statute's specific guarantee of collective bargaining rights, because DHS cannot "ensure" collective bargaining without affording employees the right to negotiate binding agreements. The District Court's decision on this point is exactly right:

> The Regulations fail because any collective bargaining negotiations pursuant to its terms are illusory: the Secretary retains numerous avenues by which s/he can unilaterally declare contract terms null and void, without prior notice to the Unions or employees and without bargaining or recourse.

*Chertoff I*, 385 F. Supp 2d at 25.

There can be no doubt that the Final Rule authorizes DHS to unilaterally abrogate any collective bargaining agreement that is negotiated under the HR system, not just those in existence when the Final Rule was promulgated. Indeed, the Government conceded this point, before the District Court, in its briefs to this court, and during oral argument. *See* Tr. of Oral Argument at 6-9 (Government counsel explicitly affirmed his understanding of the provisions in Subpart E as permitting DHS to override any collectively bargained agreement it enters, not just those extant when the regulations take effect.). We "'give substantial deference to an agency's interpretation of its own regulations.'" *Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). Accordingly, "'the agency's interpretation must be given controlling weight unless it is plainly erroneous

or inconsistent with the regulation.'" *Id.* (quoting *Shalala*, 512 U.S. at 512).

As the District Court found, the Government's proffered interpretation of the regulations is consistent with the language employed in key provisions of Subpart E. An agreement negotiated pursuant to the HR system will not take effect if found by DHS officials to be inconsistent with Department rules or regulations. *Id.* § 9701.515(d)(1)-(2). Even if not explicitly disapproved, an agreement takes effect only if it comports with, *inter alia*, the Department's "implementing directives and other policies and regulations." *Id.* at § 9701.515(d)(3). Most significantly, the regulations give DHS ongoing authority to render collective bargaining agreements "unenforceable if an authorized agency official determines that they are contrary to . . . Departmental implementing directives . . . and other policies and regulations." *Id.* § 9701.515(d)(5). Moreover, in elaborating the list of "management rights," the regulations state that "nothing in [Subpart E of the regulations] may affect the authority of any management official or supervisor of the Department . . . to take whatever . . . actions may be necessary to carry out the Department's mission." *Id.* § 9701.511(a), (a)(2). Read together, these provisions permit unilateral abrogation of collectively bargained contracts.

In the Government's view, the provisions at issue represent a reasonable, and therefore permissible, understanding of "collective bargaining." Congress required DHS to craft a HR system that is "flexible" and "contemporary," 5 U.S.C. § 9701(b)(1)-(2) (Supp. II 2002), and the Government insists that DHS deserves deference in weighing those objectives in its efforts to ensure collective bargaining. The Government's arguments on this point are completely unconvincing, because they ignore Congress' explicit command that any HR system "ensure that employees may . . . bargain collectively," 5 U.S.C. § 9701(b)(4) (Supp. II 2002). A system that gives the

Department a free hand to selectively vitiate collectively bargained agreements does not obey that command.

As noted above, "collective bargaining" is a term of art, defined in other statutory schemes, and DHS was not free to treat it as an empty linguistic vessel. *See Smith,* 544 U.S. at 233. None of the major statutory frameworks for collective bargaining allows a party to unilaterally abrogate a lawfully executed agreement. *See, e.g.,* 5 U.S.C. §§ 7102(2), 7103(a)(12) (2000) (federal sector bargaining); 29 U.S.C. § 158(a)(5), (b)(3) & (d) (2000) (private sector bargaining); 39 U.S.C. § 1206 (2000) (U.S. Postal Service); 45 U.S.C. § 152 (Fourth) (2000) (common carriers). Indeed, no statutorily mandated *collective bargaining* system that we are aware of dispenses with the premise that negotiated agreements bind both parties – no matter what the scope of bargaining was *ex ante*. Indeed, when pressed at oral argument, the Government could provide no counterexample. *See* Tr. of Oral Argument at 9-10.

The HR system embodied in the Final Rule has no antecedent, because it undermines the very idea of collective bargaining. Structuring collective bargaining so that labor and management meet to negotiate terms until they reach an accord or an impasse only makes sense on the assumption that each side's evolving bargaining position will reflect a series of trade-offs that move the parties toward a mutually satisfactory end point. It is therefore dispositive that the HSA refers to *collective bargaining* – not merely "consultation" or "notification" – in describing the Department's obligations under § 9701(b)(4). When Congress intended to *deny* collective bargaining rights and provide only advisory roles to employee representatives, it used different language. *Compare* 5 U.S.C. § 9701(b)(4) (Supp. II 2002) ("bargain collectively"), *with id.* § 9701(e) ("collaboration" or "consultation" through "meet and confer" process), *and* 5 U.S.C. § 7113 (2000) ("national consultation rights").

Finally, the Government's position not only defies the well-understood meaning of collective bargaining, it also defies common sense. As noted above, collective bargaining is a method of structuring the formation of labor contracts, and the notion of mutual obligation is inherent in contract law. *See* Restatement (Second) of Contracts § 3 (1979) ("An agreement is a manifestation of mutual assent on the part of two or more persons. A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances."). To imagine that a system might "ensure collective bargaining" without imposing mutual obligations is simply bizarre.

We emphasize that our holding relates only to DHS's power to abrogate collectively bargained contracts executed pursuant to the HR system. The Unions do not contest the Department's authority to supersede labor contracts inherited from the previously independent agencies that now constitute DHS. *See* 5 C.F.R. § 9701.506(a) (2006). Our holding does nothing to undercut the Department's authority to exercise that power.

### 2. *The Scope of Bargaining*

The right to negotiate collective bargaining agreements that are equally binding on both parties is of little moment if the parties have virtually nothing to negotiate over. That is the result of the Final Rule adopted by DHS. The scope of bargaining under the HR system is virtually nil, especially when measured against the meaning of collective bargaining under Chapter 71. And this is saying a lot, because the scope of bargaining under Chapter 71 is extraordinarily narrow. This was made clear in *NTEU v. FLRA*, 910 F.2d 964 (D.C. Cir. 1990) (en banc), where we pointed out

> the unique structure of the federal sector labor relations statute, which, because of "the special requirements and needs of the Government," 5 U.S.C. § 7101(b), excludes

from negotiations a host of subjects that employers would be obliged to bargain about in the private sector. For instance, section 7106(a), the "management rights" provision of the statute, ensures that agencies need not bargain over the number of employees, their hiring, assignment, and discharge, the right to contract out work, and the authority "to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106(a).

*Id*. at 968. There is no doubt that the restricted scope of bargaining under Chapter 71 gives federal agencies great "flexibility" in collective bargaining, of the sort contemplated by 5 U.S.C. § 9701(b)(1) (Supp. II 2002).

Having reviewed the Final Rule with care, we find that the limited scope of bargaining under the proposed HR system violates the Act, and on this point we reverse the District Court. In upholding the narrow scope of bargaining permitted under the HR system, the District Court rested its analysis primarily on the HSA's enumeration of certain nonwaivable provisions of law. Since "Congress gave the [Department] the authority to ignore the provisions of Chapter 71 and to establish new metes and bounds for collective bargaining at DHS," the court felt compelled to defer to DHS's new framework. *Chertoff I*, 385 F. Supp. 2d at 28-29. This line of reasoning fails.

The problem with the District Court's analysis and with the Government's arguments in the same vein is that they elevate one provision of the HSA over another: the Department's authority to modify the provisions of Chapter 71 is given precedence over § 9701(b)(4)'s command to ensure collective bargaining. If DHS enjoys unlimited discretion to define the "metes and bounds" of collective bargaining under the HSA, it can whittle the scope of bargaining so drastically as to render collective bargaining meaningless. Under the District Court's view, there is no stopping point – the court recognizes nothing

inherent in federal sector collective bargaining that fixes the scope of bargaining in the absence of Chapter 71.

This reasoning is fatally flawed, because, as noted above, nothing in the HSA suggests that the meaning of "collective bargaining" under Chapter 71 can be disregarded by the Department in its promulgation of the HR system. If, as we have shown, "collective bargaining" in the HSA derives its meaning from the same term in the FSLMRA, then application of the term under the latter statute must guide our understanding of how the term applies under the former. We cannot assume that Congress deployed a term of art, with a long history of legal usage, while contemplating that DHS could completely drain that term of significance.

A core element of collective bargaining is a requirement that labor and management bargain in good faith over conditions of employment for purposes of reaching an agreement. Indeed, the Final Rule purports to adopt this understanding of collective bargaining in its definition of the term. *See* 5 C.F.R. § 9701.504 (2006). The scope of bargaining under the Final Rule, however, does not come close to reaching this core element. As the District Court found, "[t]he HR System essentially reduces collective bargaining to employee-specific terms affecting discipline, discharge and promotion." *Chertoff I*, 385 F. Supp. 2d at 29. This is so far short of the meaning of collective bargaining under Chapter 71 that we are constrained to hold that the Final Rule does not meet the HSA's requirement of bargaining in good faith over conditions of employment for purposes of reaching an agreement.

It is readily apparent that the Final Rule reflects a flagrant departure from the norms of "collective bargaining" underlying Chapter 71. In fact, the Government acknowledges the striking disparity between the FSLMS framework and the system established for DHS. *See* DHS's Reply Br. at 13. Even a quick glance at the Final Rule confirms what the Government

acknowledges, *i.e.*, that the HR system shrinks the scope of bargaining well below what Chapter 71 provides. For example, "permissive" areas of bargaining under Chapter 71 are off limits for negotiation at DHS. *Compare* 5 U.S.C. § 7106(b)(1) (2000), *with* 5 C.F.R. § 9701.511(a)(2) & (b) (2006). This distinction is critical. Procedures for exercising rights affecting issues like work assignments and deployments are negotiable under Chapter 71, but not under the HR system. And, under the HR system, when management exercises one of its rights, it need not provide notice to labor representatives in advance. 5 C.F.R. § 9701.511(d) (2006). Moreover, the proposed HR system gives DHS broad new authority "to take whatever other actions may be necessary to carry out the Department's mission." *Id.* § 9701.511(a)(2) (2006). Presumably, this provision empowers DHS to take any matter off the bargaining table at any time, regardless of what concessions have already been made by union representatives. No analogous power exists anywhere in Chapter 71. Most strikingly, DHS management is prohibited from negotiating over the "procedures it will observe in exercising" the authority laid out in subsections (a)(1) and (a)(2) of the management rights provision. *Id.* § 9701.511(b). Instead, management must merely "confer" with labor representatives about the procedures it will use. *Id.* § 9701.511(c). These provisions stand in sharp contrast to Chapter 71's obligation to bargain over the procedures used to exercise management rights. 5 U.S.C. § 7106(b)(2) (2000).

Finally, Chapter 71 requires agencies to bargain over "appropriate arrangements" for employees adversely affected by the exercise of a management right. *Id.* § 7106(b)(3). The HR system shrinks such bargaining considerably. For the "operational matters" committed to management discretion under § 9701.511(a)(1)-(a)(2), DHS must negotiate appropriate arrangements only when "the effects of [management's exercise of a right] have a significant and substantial impact on the bargaining unit, or on those employees in that part of the

bargaining unit affected by the action or event, and are expected to exceed or have exceeded 60 days." *Id.* § 9701.511(e)(2)(i). Even under these narrow circumstances, appropriate arrangement proposals must be limited to such matters as personal hardships and safety measures, or reimbursements for out-of-pocket expenses. *Id.* § 9701.511(e)(2)(i)(A)-(B). The Final Rule thus effectively strips the term "collective bargaining" of any real meaning in limiting the scope of bargaining.

Our decision in *Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985) ("*ATU*"), although not controlling here, is instructive. The Urban Mass Transportation Act allowed formerly private transit companies that had been transferred to public ownership to receive federal funds if the Secretary of Labor certified that the transit authority had forged a "fair and equitable" labor protective agreement with its union that included, *inter alia*, provisions ensuring employees of "the continuation of collective bargaining rights." *See id.* at 940 (explicating 49 U.S.C. App. § 1609(c) (1982)). We found that "collective bargaining" had accumulated significance through its history of usage. The *ATU* court rejected the Secretary's invitation to measure the right to collective bargaining by reference to state law:

Congress neither imposed upon the states the precise definition of "collective bargaining" established by the [National Labor Relations Act] and the case law that has developed under that Act, nor did it employ a term of art devoid of all meaning, leaving the states free to interpret and define it as they saw fit. Instead, Congress used the phrase generically, incorporating within the statute the commonly understood meaning of "collective bargaining." The 1964 Congress was not writing on a clean slate. Then as now, collective bargaining was universally understood to require, at a minimum, *good faith* negotiations, to a point of

impasse, if necessary, over wages, hours and other terms and conditions of employment.

*Id.* at 949. We noted that those principles "have long been the bedrock of collective bargaining in the federally-regulated private sector" and that they had also "provided the common denominator of the public sector collective bargaining schemes enacted by the states." *Id.* Accordingly, we acknowledged that the statute attempted "a delicate balance" by conditioning federal transportation aid on collective bargaining rights while not incorporating the NLRA wholesale, but we deemed it "clear that federal labor policy would dictate the substantive meaning of collective bargaining for purposes of section 13(c)." *Id.* at 950.

A similar analysis applies here, because Congress "was not writing on a clean slate" when it enacted the HSA. The Government would have us impute to Congress the expectation that, as used in the HSA, "collective bargaining" has no particular content, thus leaving DHS wholly unconstrained to define the term as it wishes. Because we have no evidence to indicate that Congress chose to "employ a term of art devoid of all meaning," we conclude that Chapter 71 must inform the substantive meaning of collective bargaining for purposes of § 9701(b)(4). Accordingly, the scope of bargaining under HSA must be guided by the federal labor policy underlying the permissible scope of bargaining in the federal sector. The parameters of the scope of collective bargaining under the FSLMS are narrow and flexible, so Chapter 71 gives appropriate guidance to DHS in how to ensure collective bargaining for its employees. *See, e.g.*, *FLRA v. OPM*, 778 F.2d 844, 845 (D.C. Cir. 1985) ("[T]he scope of collective bargaining is far narrower in the federal sector than in the private sector.") (citing H. ROBINSON, NEGOTIABILITY IN THE FEDERAL SECTOR 189 (1981)). For example, Chapter 71's enumeration of management rights places a number of substantive topics off limits for bargaining, 5 U.S.C. § 7106(a) (2000), but it also requires that

agencies negotiate over the "impact and implementation" of those rights, *id.* § 7106(b). *See FLRA v. U.S. Dep't of Justice*, 994 F.2d 868, 871-72 (D.C. Cir. 1993). This general framework must be followed by DHS to ensure collective bargaining for its employees, as required by the HSA.

Using Chapter 71 to give content to the HSA's collective bargaining requirement is perfectly consistent with the Act's authorization to proceed "notwithstanding" many sources of law. Chapter 71 has numerous provisions that do not directly inform the definition of collective bargaining; many would impede DHS's flexibility if it lacked the freedom to waive them. Most conspicuously, Chapter 71 envisions a significant role for FLRA: it establishes that the "Authority shall provide leadership in establishing policies and guidance relating to matters under this chapter" and that, with specified exceptions, it should "be responsible for carrying out the purpose of this chapter." 5 U.S.C. § 7105(a)(1) (2000). It also gives the Authority extensive power to investigate, adjudicate, and enforce labor practices in the federal sector. *Id.* § 7105(a)(2) & (g). Yet, it is beyond dispute that the HSA permits DHS to bypass the Authority altogether in setting up a HR system. Similarly, Chapter 71 establishes a process for the resolution of bargaining impasses, *id.* § 7119, which DHS chose not to incorporate into its HR system. Chapter 71 also proscribes numerous unfair labor practices. *See id.* § 7116. The ability to selectively waive or modify § 7116 clearly comports with the HSA's stated imperatives of flexibility and contemporaneity.

Furthermore, it must be recalled that the duty to bargain does not require agreement, only a good faith effort by the parties to reach agreement. *Id.* §§ 7103(a)(12), 7114(a)(4) & (b). Additionally, employees in the federal sector are forbidden from striking, *Prof'l Air Traffic Controllers Org. v. FLRA*, 685 F.2d 547, 550 (D.C. Cir. 1982), so they can add no economic leverage to their bargaining demands as can employees in the private

sector. And, most importantly, employees covered by DHS's HR system will not have the advantage of an impasses panel – which can *impose* conditions of employment if the parties' negotiations reach an impasse, *see* 5 U.S.C. § 7119(c)(5)(B)(iii) (2000) – as do employees who are covered by Chapter 71. In other words, if the Department follows the core notion of "collective bargaining" in the federal sector in defining the scope of bargaining under the HR system, as the Act requires, DHS will have extraordinary "flexibility" to achieve the goals of the statute and, at the same time, "ensure" that the limited benefits flowing from a "contemporary" program of collective bargaining in the federal sector are made available to its employees. The Act mandates no less.

**3. *The Final Rule Fails to Ensure Collective Bargaining for DHS Employees in Two Critical Respects – Therefore No Deference is Due the Department's Interpretation of the HSA***

The foregoing discussion makes it clear that, insofar as the Final Rule permits the Department to abrogate final agreements and narrowly limits the scope of bargaining to employee-specific terms, the regulations fail to "ensure" collective bargaining for DHS employees. In these circumstances, we owe no deference to DHS's interpretation of the HSA.

As we explain above, *Chevron* analysis typically "is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) (citation and inner quotation marks omitted). An agency construction of a statute cannot survive judicial review, however, if a contested regulation reflects an action that is inconsistent with the agency's authority. It does not matter whether the unlawful action arises because the

disputed regulation defies the plain language of a statute or because the agency's construction is utterly unreasonable and thus impermissible. *Am. Library Ass'n*, 406 F.3d at 699 (citing *Aid Ass'n for Lutherans,* 321 F.3d at 1174).

In this case, as we have shown, DHS's Final Rule defies the plain language of the Act, because it renders "collective bargaining" meaningless; and it is utterly unreasonable and thus impermissible, because it makes no sense on its own terms. The Government's argument is premised on a view that DHS's authority to modify the provisions of Chapter 71 takes precedence over § 9701(b)(4)'s command to ensure collective bargaining. As we have explained, this is simply wrong. The agency's policy preferences cannot trump the words of the statute.

**D.   The Role of the HSLRB**

The Unions also argue that DHS's HR system impermissibly shrinks the collective bargaining requirement in a third way: by funneling bargaining disputes to HSLRB. The Unions object to HSLRB, because, in their view, the new board lacks sufficient independence to provide the neutral adjudication required of a collective bargaining regime. As noted above, HSLRB is composed of members appointed by the Secretary of Homeland Security. 5 C.F.R. § 9701.508(a)(1) (2006). The Secretary also retains discretion to remove HSLRB members "on the same grounds as an FLRA member," *id.* § 9701.508(a)(2), *i.e.*, "upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 7104(b) (2000). Among other things, HSLRB adjudicates disputes concerning the scope of bargaining and the duty to bargain in good faith, most unfair labor practice charges, disputes concerning information requests, exceptions to arbitration awards in cases involving the exercise of management rights or the duty to bargain, and negotiation impasses. 5 C.F.R. § 9701.509(a)(1)-(5) (2006). The Unions insist that concentrating so much authority in a body effectively

run by management obliterates any chance for review by a neutral arbiter. Existing labor relations statutes, the Unions argue, reveal Congress' understanding that neutral arbitration is fundamental to collective bargaining in the federal sector. The regulations thus violate the statute, according to the Unions, by assigning responsibility for adjudicating labor disputes to a management-controlled board.

Our holding in Part E below, relating to the role of FLRA under the HR system, renders this issue unripe for resolution. The Final Rule is flawed insofar as it allows DHS to encroach on FLRA's operations without the statutory authority to do so. Accordingly, we affirm the District Court's judgment vacating the portions of the regulations pertaining to the Authority. We have no way to know, however, what form the revised regulations will take. In particular, we have no way of knowing what HSLRB's role will be under a revised Final Rule, nor do we know whether DHS will opt to create other boards to carry out the functions now assigned to FLRA. Indeed, we do not know whether DHS might elect to allow disputes arising under the HR system to be resolved by FLRA pursuant to the Authority's defined jurisdiction under Chapter 71. In short, the issues relating to the efficacy of HSLRB under the HR system are premature.

## E. DHS's Attempt to Regulate FLRA

The Government appeals the District Court's finding that DHS exceeded its statutory authority by assigning new protocols to FLRA. The District Court was "convinced that [DHS] cannot commandeer the resources of an independent agency and thereby fundamentally transform its functions, absent a clearer indication of congressional intent." *Chertoff I,* 385 F. Supp. 2d at 32. We agree.

As explained above, the Final Rule quite clearly intends to impose a novel procedural scheme on FLRA, even though

nothing in the HSA authorizes DHS to regulate the work of the Authority or alter its statutory jurisdiction. The Authority is an independent agency operating pursuant to its organic statute under Chapter 71. *See* 5 U.S.C. § 7104 (2000). Chapter 71 prescribes FLRA's functions and authority. The Authority is empowered to make a host of determinations related to labor negotiations and disputes, including "resolv[ing] issues relating to the duty to bargain in good faith," "conduct[ing] hearings and resolv[ing] complaints of unfair labor practices," and "resolv[ing] exceptions to arbitrator's awards" under Chapter 71. *Id.* § 7105(a)(2)(E) & (G)-(H). DHS's Final Rule attempts to conscript FLRA into reviewing a narrowly defined area of cases under an intensely deferential standard of review. *See* 5 C.F.R. § 9701.508(h) (2006). Whereas FLRA's statutory function involves the exercise of judgment and significant authority, the Final Rule shrinks the Authority's role, using it only to guard against substantial adjudicative failures by HSLRB. Indeed, under the Final Rule, FLRA's role with respect to any matter relating to a DHS employee would evaporate if HSLRB "determines that the matter affects homeland security." *Id.* § 9701.509(a)(7); *see also id.* § 9701.510(b). The role of FLRA under the HR system bears no resemblance to its normal statutory role, and conforming to the regulations would therefore require FLRA to substantially change its operating functions.

The Government fruitlessly searches 5 U.S.C. § 9701 for the authority necessary to rearrange FLRA's operations. To justify its purported exercise of authority over FLRA, the Government relies, first, on § 9701(a)'s mandate to establish a new human resources scheme "notwithstanding any other provision of this part." But this language does not justify DHS's attempt to regulate FLRA, because the cited provision applies only to regulations relating to "a human resources management system for some or all of the organizational units of the Department of Homeland Security." 5 U.S.C. § 9701(a) (Supp. II 2002). FLRA, quite obviously, is not an organizational unit of DHS.

Consequently, the "notwithstanding" clause is not relevant. The "notwithstanding" clause does nothing more than establish DHS's freedom to design its own internal human resources scheme. It does not serve as a license for DHS to draft an independent agency to do its bidding pursuant to terms prescribed by the Department.

The Department's second defense of its intrusion into FLRA's internal operations is similarly farfetched. Citing the enumeration of certain non-waivable provisions of law, DHS urges us to draw a sweeping negative implication, claiming authority to "modify" any unenumerated legal provision. We refuse to negatively infer, from a *restriction* of authority, a broad *grant* of power that would authorize DHS to prescribe procedures for independent agencies. *See Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."). Extended to its logical limit, the Government's interpretation of the statute would allow the Department to overtake *any* agency to achieve its own ends – indeed, it could even claim to revise the standards of review in federal courts. Such a sweeping grant of authority exists nowhere in the HSA.

## F.   The Role of MSPB

Two issues related to the role of MSPB under the HR system are before us on appeal. As we explained above, DHS appeals the District Court's determination that MSPB's standard of review in penalty mitigation cases violates HSA's command to provide "fair" appellate procedures; we reversed that holding, finding the Unions' claim unripe for review. Additionally, the Unions cross-appeal the District Court's determination that DHS was entitled to *Chevron* deference in assigning MSPB an

appellate role in mandatory removal cases. We affirm the District Court on this point.

The Act explicitly contemplates that, under certain conditions, the HR system will effectively "modify procedures under chapter 77 [5 U.S.C. §§ 7701-7703 (2000)]," which is the statutory framework governing MSPB's appellate procedures. 5 U.S.C. § 9701(f)(2)(C) (Supp. II 2002). Unlike its intrusion into FLRA's domain, then, the Department's modification of MSPB's procedures has a clear statutory predicate. It is also noteworthy that Congress directed DHS and OPM to consult with MSPB in crafting appellate procedures.

Moreover, the statute delineating MSPB's powers and functions authorizes it to:

> hear, adjudicate, or provide for the hearing or adjudication, of all matters within the jurisdiction of the Board under this title, chapter 43 of title 38, or *any other law, rule, or regulation*, and, subject to otherwise applicable provisions of law, take final action on any such matter.

5 U.S.C. § 1204(a)(1) (2000) (emphasis added). Congress thus clearly intended MSPB to serve a broad function that may be defined in diverse ways. Given MSPB's broad statutory underpinning, we find no error in the District Court's judgment upholding DHS's action.

## G. The Scope of the Injunction

Because we have substantially upheld the District Court's judgments regarding the legality of the Final Rule, we must address DHS's contention that the District Court's injunction sweeps too broadly. DHS contends in particular that it was improper to enjoin Subpart E in its entirety. The Government's argument is mostly pointless, however, because our decision here invalidates a broader portion of Subpart E than did the District Court. Curing the problems we have identified will require not

only making collective bargaining mutually binding and respecting FLRA's independent authority, but also adjusting the scope of bargaining. The injunction the Government proposed to the District Court did not anticipate our holding, and the Government's appellate brief supplies no insight into how Subpart E might be revised to address the concerns raised by our decision.

Even if the Government had anticipated our holdings and attempted to address them, we still would have been disinclined to pursue a dissection of the Final Rule. "Severance and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own." *Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (quoting *North Carolina v. FERC*, 730 F.2d 790, 795-96 (D.C. Cir. 1984). Moreover, we are obliged to respect "the fundamental principle that agency policy is to be made, in the first instance, by the agency itself – not by courts, and not by agency counsel." *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989). Accordingly, courts generally "do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." *Id.* We will leave these matters to be addressed by the parties and the District Court on remand of this case.

### III. CONCLUSION

The allowance of unilateral contract abrogation and the limited scope of bargaining under DHS's Final Rule plainly violate the statutory command in the HSA that the Department "ensure" collective bargaining for its employees. We therefore vacate any provisions of the Final Rule that betray this command. DHS's attempt to co-opt FLRA's administrative machinery constitutes an exercise of power far outside the Department's statutory authority. We therefore affirm the District Court's decision to vacate the provisions of the Final

Rule that encroach on the Authority. We reverse the District Court's holding that MSPB's standard of review in penalty modification cases represents a failure to provide "fair" appellate procedures, because that issue is not yet ripe for review. And we express no view on the role of the HSLRB, because the matter cannot be addressed until DHS revises the Final Rule. Finally, we decline to amend the injunction.

The judgments of the District Court are affirmed in part and reversed in part, and the case is hereby remanded for further proceedings consistent with this opinion.

*So ordered.*